EASTERBROOK, Circuit Judge.
 

 The Rock Island line was a landlord as well as a railroad. It rented land on which the tenants built grain elevators, among other things. Many of these leases were terminable on 30 days’ notice, which exposed the elevator operators to a risk: the Rock Island might cancel, acquire ownership of the elevators, and lease the land for a much higher rent reflecting the value of the elevators the tenants had built. (The tenants had 10 days after the end of the lease to remove their improvements, after which the Rock Island acquired ownership. Few people recall seeing grain elevators rolling down the highway en route to new sites after being evicted from their old ones.) Iowa controlled the rent for the Rock Island’s land, however, which made it impossible for the Rock Island to take advantage of the elevator operators in this way.
 

 The Rock Island’s bankruptcy presented it with an opportunity to turn the screws on its lessees. The Iowa statute applied only to lessees of railroads, and in 1980 the district judge supervising the Rock Island’s
 
 *1184
 
 bankruptcy instructed it to stop being a railroad. It did, and its Trustee — told to maximize the value of the estate without regard to good business relations — proposed large increases in the rent of the land underlying many grain elevators. Negotiating to avoid stupendous increases in rent, many of the elevators’ operators bought the underlying land from the Rock Island at prices that reflected part or all of the value of the elevators themselves.
 

 When the Trustee increased one lessee’s rent by 5900%, from $100 to $6,000 per month, the lessee balked. It declined to pay, vacate, or buy at the Trustee’s price. See
 
 In re Chicago, Rock Island & Pacific R.R.,
 
 753 F.2d 56 (7th Cir.1985)
 
 (Rake). Rake
 
 held that the district court could not allow the Trustee to charge a rent based on the value of the grain elevator. Instead, “the unimproved value of the ... property provides the better basis for an equity court to determine the fair rent” the Trustee may charge. 753 F.2d at 60. The limitation on the maximum rent affected the price the Trustee could expect to realize in a sale of the same property.
 

 In mid-1982, before we decided
 
 Rake,
 
 Iowa extended its rent control law to railroads’ successors. This closed the window of opportunity for the Rock Island, restoring the system that had been interrupted by the Rock Island’s transition from railroad to real estate magnate. The reorganization court held the statute preempted by the bankruptcy laws on the ground that it reduced the value of the estate. We disagreed, because rent control of grain elevators has been constitutional since
 
 Munn v. Illinois,
 
 94 U.S. (4 Otto) 113, 24 L.Ed. 77 (1876), and a bankrupt’s property rights are governed by state law.
 
 In re Chicago, Rock Island & Pacific R.R.,
 
 772 F.2d 299 (7th Cir.1985),
 
 cert. denied,
 
 — U.S. -, 106 S.Ct. 1265, 89 L.Ed.2d 574 (1986)
 
 (San-born I).
 
 If a going railroad may be burdened with a rent control scheme, so may a defunct railroad. Iowa’s statute reduced the price the Trustee could realize, but a statute forbidding the Trustee to build a casino or dump radioactive waste on the land would have done the same.
 

 I
 

 Between the decisions in
 
 Rake
 
 and
 
 San-born I,
 
 the district court entered the order before us today. The dispute concerns the same land that was at stake in
 
 Sanborn I.
 
 The Sanborn Cooperative Grain Company leased 4.4 acres in Melvin, Iowa, from the Rock Island and built a grain elevator. The lease could be canceled by either party on 30 days’ notice. The going rental was $2,404.65 per year. In September 1982 the Trustee gave the 30 days’ notice and informed Sanborn that on November 1, 1982, it could either pay a new rent of $2,450 per month or quit the property. Sanborn refused to pay, and the parties agreed that Sanborn could remain in possession pending a sale of the land, which everyone assumed would be to Sanborn. They also agreed that the court would fix the rent for the period before the sale.
 

 Robert Kent topped Sanborn’s bid, and the Trustee sold the land to Kent on November 1, 1983, for $100,000. (Kent paid $120,000 for two parcels and apportioned $100,000 to the Melvin parcel. We need not decide whether the lopsided apportionment was justified.) Kent demanded a rent of $2,400 per month. Sanborn then invoked the new rent control law, and Iowa officials set a rent of $2,025 per year, leading Kent to seek the reorganization court’s aid. This produced
 
 Sanborn I.
 
 Meanwhile the court wound up the Rock Island bankruptcy. The Rock Island, renamed Chicago Pacific Corporation (CPC), emerged as a solvent firm. The closing order preserved for decision any pending controversies, and the dispute about the rent for the Melvin property between November 1, 1982, and November 1, 1983, is such a controversy. Sanborn was a holdover tenant, and the dispute about what it would pay before the sale to Kent was an adversary proceeding in the bankruptcy. The court also concluded that it was entitled to fix the rent Kent would receive from the time it bought the land until Sanborn paid up or got out. This raises a jurisdictional problem discussed below.
 

 
 *1185
 
 By the time the court conducted a valuation proceeding,
 
 Rake
 
 had held that the appropriate rental is based on the value of unoccupied land. Sanborn presented a real estate appraiser who concluded that 4.4 acres of unimproved land at the site of the elevator was worth $15,000 in 1982-83. CPC presented evidence that vacant land in Melvin was worth $3,000 to $4,000 per acre, essentially agreeing with Sanborn’s expert. But CPC argued that the appropriate way to value the land was to examine the price the Trustee had realized when selling land to the operator-lessees of other elevators. These deals, CPC insisted, show that the market value of the land was $147,000.
 

 The reorganization court fixed the value at $125,000, stating:
 

 The first contention of Sanborn, that is that the property should be valued as vacant, is inconsistent with the realities of the situation. The property is not vacant but in fact is a tract containing a grain elevator. It is because it contains a grain elevator that it was valuable to Sanborn and is now valuable to Kent.
 

 The judge applied CPC’s preferred method of comparing the Melvin elevator with comparable ones, although the judge did not explain why he picked $125,000 rather than the higher value for which CPC contended or the lower price Kent had paid for the parcel. (An actual price, such as Kent’s, is a far better indicator of the value of
 
 this
 
 parcel than is a hypothetical price based on sales of other parcels.) The court concluded that a landlord would collect an annual rent of 20% of the market value of the land, here $26,250. It gave Sanborn credit for some prepaid rent at the old rate and directed it to pay CPC a net of $23,845.35 for the period before November 1, 1983. Then the court decreed Sanborn’s rent to Kent to be $29,400 per year, from November 1, 1983, until Sanborn finally vacated. The judge did not explain how he arrived at $29,400. This figure turns out to be 20% of the $147,000 valuation for which CPC had argued — and which the court rejected.
 

 Two weeks after the reorganization court entered this order, we held in
 
 San-bom I
 
 that the Iowa rent control statute applies to the Melvin property in Kent's hands. This upset the basis of the district court’s order setting Sanborn’s rent to Kent. It also upset the basis of the deal between the Trustee and Kent, who thought he was buying a property with the potential to produce $2,000 or more a month in rent. After the Supreme Court declined to review
 
 Sanborn I,
 
 CPC and Kent rescinded the sale of the two parcels. CPC maintains that as Kent’s successor in interest it is entitled to the $29,400 rental between November 1, 1983, and June 1, 1984, the date of the order winding up the Rock Island’s bankruptcy.
 

 II
 

 Rake
 
 held that the Trustee must charge a rental based on the value of unimproved land. The reorganization court refused to apply
 
 Rake.
 
 It did not cite the case, although the valuation proceeding had been held after
 
 Rake
 
 and all parties had made that case the focus of their evi-dentiary presentations. The judge’s conclusion that the rule of law contained in
 
 Rake
 
 “is inconsistent with the realities of the situation” is unacceptable. Perhaps
 
 Rake
 
 is mistaken or “inconsistent with the realities”; there is an unavoidable rate of error in all legal decisionmaking. Cases establish rules of law just as statutes do, however, and these rules have general application. District judges must follow the rules established in statutes and cases alike, no matter how misguided the judges may think them.
 
 United States v. Burke,
 
 781 F.2d 1234, 1239 n. 2 (7th Cir.1985).
 
 Rake
 
 involves grain elevators built by tenants on the land of the Rock Island in Iowa; no closer precedent can be imagined; it supplies the rule of decision here as well.
 

 The witnesses in this case agreed that 4.4 acres of unimproved land near the (abandoned) railroad tracks in Melvin, Iowa, was worth somewhere between $13,-140 and $17,520 in 1982. The district court’s valuation of $125,000 in explicitly based on the point that the Melvin parcel is
 
 not
 
 vacant.
 
 Rake
 
 makes this valuation
 
 *1186
 
 untenable. It does not help CPC to cite the Trustee’s sales of other parcels containing grain elevators. These sales occurred before the decisions in
 
 Rake
 
 and
 
 Sanborn I.
 
 The prices were negotiated against the background of large increases in rent, accompanied by the Trustee’s position that if the owners of the elevators did not pay the rent the Trustee could sell to a third party. The third party’s bid would be for the package of land and elevator, as Kent’s was. To buy the land the current lessees had to top these bids, be they actual or anticipated. So the prices the Trustee realized were based, at least in part, on the value of the land as improved by the grain elevators. To use these prices as benchmarks is to value the land as improved, a point the district judge understood.
 

 Sanborn I
 
 reiterated the rule of
 
 Rake,
 
 so within two weeks after the district court’s decision it should have been clear to all that a valuation of $125,000 could not endure. The parties should have settled this case or returned to the reorganization court for a new valuation. Instead CPC stoutly defended the valuation on appeal, pretty much as if
 
 Rake
 
 and
 
 Sanborn I
 
 had never been decided. The duration and small stakes of this proceeding, coupled with CPC’s unyielding posture, make it desirable to bring things to a conclusion now. CPC therefore is entitled only to the rent provided in the last lease it had with San-born. (The alternative, using the rent fixed by Iowa’s authorities, is even less favorable to CPC.) The old rent was $2,404.65 per year, or about 16% of the mean valuation for unimproved land offered by the witnesses. Sanborn had prepaid a year’s rent (as the lease required) running through February 1983. Sanborn therefore owes CPC eight months’ rent, or $1,603.10, for the period before the sale to Kent on November 1, 1983. Because the rent was to be prepaid, interest on this sum should run from March 1, 1983, at the rate of prejudgment interest appropriate under the law of Iowa.
 

 Ill
 

 The sale to Kent has been rescinded, and CPC argues that because the rescission restores everyone to the position that existed on November 1, it is entitled to a judgment for rent through June 1, 1984, when the order closing the bankrupt’s estate was entered. CPC wanted rent at the rate of $29,400 per year through June 1, 1984; given the holding above, the rent is much less. Had the Trustee never sold the Melvin parcel, CPC might be entitled to this small sum. But the Trustee did sell, and on November 1, 1983, the land left the estate. It was reacquired not by the Trustee but by CPC. The reacquisition occurred long after the Rock Island’s bankruptcy was over. In the interim Kent had suffered an adverse judgment declaring that the rent for the parcel may be fixed by the Iowa authorities. CPC and Kent cannot, by undoing the sale between themselves, deprive Sanborn of a favorable judgment. The rescission does not restore the status quo as of November 1, 1983. Instead CPC steps into Kent’s shoes and has Kent’s rights and responsibilities.
 

 Kent had no valid judgment it could transfer to CPC, because the reorganization court lacked jurisdiction. That some land was once owned by a bankrupt does not supply federal jurisdiction of disputes concerning that land. New disputes — arising after the closure of the bankruptcy, or after the land has been sold by the Trustee to a third party — must be resolved through the processes available for such independent disputes. When a bankrupt railroad (or any other bankrupt) sells property with the approval of the court, the buyer acquires title clear of all claims in the bankruptcy. The property may not be hauled back into the estate, and the terms of the sale are inviolate in the absence of fraud or collusion.
 
 In re Suchy,
 
 786 F.2d 900 (9th Cir.1985);
 
 In re Rock Industries Machinery Corp.,
 
 572 F.2d 1195, 1198 (7th Cir.1978). The court’s jurisdiction lapses with its control of the property.
 

 The reorganization court had jurisdiction of the dispute about the rent through No
 
 *1187
 
 vember 1, 1983, only as an adversary dispute in the bankruptcy. This is a form of ancillary jurisdiction, see 28 U.S.C. § 1334(b) and Bankruptcy Rule 7001, which enables one court to supervise the entire restructuring. Once property is sold, however, further disputes are not ancillary to anything. They have nothing to do with the debtor. The squabble between Kent and Sanborn affected Kent’s welfare, not the Trustee’s; no increase in Kent’s rent would have redounded to the benefit of the Rock Island’s investors.
 

 The district court concluded that it had jurisdiction to protect the order approving the sale. The order had been meant to put Kent in control of the property; Sanborn had frustrated this. The district judge thought that as soon as Kent became the owner of the land, Sanborn became a trespasser, without the benefit of the agreement deferring its departure pending the sale. He continued:
 

 The action of Sanborn thereafter of prevailing upon the state court of Iowa to enjoin Kent from evicting Sanford [sic] from property it wrongfully occupied, and the proceedings of Sanborn before the Iowa Department of Transportation to determine a rental under a statute which this court has held inapplicable to this property, aptly described in the Kent memorandum as the Sanborn-generated “... morass of legal proceedings
 
 ...”
 
 has put Sanborn in the position of defying an order of this court and obstructing the possession of Kent under a title awarded by order of this court. It is therefore not true, as Sanborn would argue, that its relationship with Kent is outside the jurisdiction of this court and a matter to be resolved by Sanborn and Kent under Iowa law. It is the position of this court, therefore, that the continued occupancy of the property by San-born is in defiance of the adjudication of this court as to the rights of the Chicago Pacific Corporation and Kent, and that the court has jurisdiction to determine the final disposition of this matter and the reasonable rent to be paid by San-born to Kent.
 

 This analysis contains two strands. One is that Sanborn’s acts violate the judgment transferring the land. Because a court has jurisdiction to effectuate its judgments,
 
 McCall-Bey v. Franzen, 111
 
 F.2d 1178, 1183 (7th Cir.1985), it has jurisdiction of the dispute between Sanborn and Kent. The other is that Sanborn’s intransigence reduces the value of the property to Kent. What reduces the value to today’s buyer will cause future bidders to offer less for similar parcels, and so to preserve the value of the estate it is necessary to preserve the value of each parcel after the conveyance. The second strand is clearer in the district court’s opinion holding the Iowa rent control law invalid:
 

 The instant case ... involves, in its purest sense, a private rental dispute between a property owner and his tenant. It is exactly the indirect, underlying relationship of the Trustee to this dispute, however, which implicates this court’s jurisdiction over this matter. According to Kent, representations made to him by the Trustee and his agents concerning the rental value and the inapplicability of the Iowa statutes were key to his decision to purchase the Iowa properties.... [T]he Trustee’s ability to maintain his past sales of similar leased properties in Iowa and to engage in future sales of such properties is directly involved in this dispute_ “If the purchasers of this property cannot rely upon this court’s order to protect them against the destruction of the value of their investments, the Trustee will be unable to sell any of this real estate at its market value.”
 

 Neither of these grounds is sufficient. As we discuss at the end of this opinion, jurisdiction may nonetheless be based on diversity of citizenship.
 

 The district court could not invoke jurisdiction to effectuate its judgment. The district court ordered Sanborn to pay Kent $29,400 annual rent, yet the sale order of November 1, 1983, did not fix a rental.
 
 *1188
 
 The order also did not direct Sanborn to vacate the land. It did not purport to extinguish Sanborn’s rights. It simply transferred the land from the Trustee to Kent, subject to any rights Sanborn had under the lease. Sanborn’s effort to vindicate these rights under state law did not violate the order of sale. Sanborn probably was not even a party to this judgment of November 1. It was a lessee and an unsuccessful bidder; it did not intervene in the bankruptcy. The order of sale fixed rights between the Trustee and Kent, not between Kent and Sanborn. True, the order of sale confirmed the transfer free and clear of any claim by Sanborn under Iowa “House File 2334”; the district court did this in response to Sanborn’s claim that the Trustee could not sell the land without the prior approval of state officials. See
 
 Sanborn I,
 
 772 F.2d at 301. The implementation of this provision in the order was the basis of jurisdiction in
 
 Sanborn I
 
 but does not support jurisdiction here. The land was transferred to Kent without the approval required by Iowa law, and Sanborn did not later claim that the transfer was invalid. So if this provision of the order of sale bound Sanborn, which is questionable, Sanborn did not attempt to undermine the decision.
 

 The district court’s claim that the need to prevent lessees from reducing the value of the land — and indirectly reducing the value the estate could realize from similar sales in the future — supplies jurisdiction amounts to saying that courts have jurisdiction when there is a utilitarian reason for them to do so. But jurisdiction is the
 
 power
 
 to decide. It must be conferred, not assumed. Neither the district court nor the parties referred to a statute authorizing the court to decide disputes of this sort.
 

 For what it is worth, we doubt that jurisdiction of this character is a Good Thing. Anything that could happen to this property in the future will affect its present value, and the desire to maximize the value for the estate then would imply a continuing federal jurisdiction over Kent’s travails. Anyone who could trace his title to a bankrupt could invoke federal jurisdiction. This would be a radical expansion of federal jurisdiction. The presence of a federal right or decision in the chain of title is not enough to allow a federal court to decide, for otherwise every dispute about a contract touching on a right with a federal basis (such as a contract about a copyrighted work) would present a federal question. See
 
 T.B. Harms Co. v. Eliscu,
 
 339 F.2d 823 (2d Cir.1964) (Friendly, J.). Only when federal law supplies the rule of decision, or an interpretation of a federal right is an essential ingredient of the claim, does the dispute present a federal question.
 
 Gully v. First National Bank,
 
 299 U.S. 109, 57 S.Ct. 96, 81 L.Ed. 70 (1936);
 
 Bernstein v. Lind-Waldock & Co.,
 
 738 F.2d 179, 183-85 (7th Cir.1984). Cf.
 
 Hilgeford v. Peoples Bank,
 
 776 F.2d 176 (7th Cir.1985).
 
 San-born I
 
 permits state laws regulating property rights to diminish the price a bankrupt can realize for property. Just as state law supplies the rule of decision for disputes about the property transferred from bankrupts, so state courts are the proper forums for disputes about the property that once was owned by bankrupts.
 

 A federal court is open only if there is an independent source of jurisdiction. Adventitiously, there is one here: Kent is a citizen of Illinois, and Sanborn is an Iowa corporation with its principal place of business in Iowa. The original amount in controversy (the only one that mattered) exceeded $10,000, because Kent wanted more than $25,000 per year in rent. This ground is available now that the other sources of jurisdiction have failed. E.g.,
 
 Buethe v. Britt Airlines, Inc.,
 
 787 F.2d 1194, 1196 (7th Cir.1986). There are some technical problems. Kent did not file the suit in Iowa (the appropriate venue); he did not file an adequate complaint but tried to linger on in a suit he visited only as a buyer of land. Venue and the adequacy of the complaint may be waived, however, and Sanborn, after objecting to both the complaint and venue, waived both by failing to raise these questions on appeal. The dis
 
 *1189
 
 trict court therefore had jurisdiction of this dispute as a diversity case. Because the substitution of CPC for Kent does not destroy diversity that was established at the outset, there is jurisdiction still.
 

 The disposition of the merits is straightforward. The authorities in Iowa fixed Sanborn’s rent to Kent at $2,025 per year for the five years beginning November 1, 1983. Kent did not pursue a challenge to this decision through the courts of Iowa. Kent instead sought to persuade us that the bankruptcy laws preempt the state’s law. That contention was swept away by
 
 Sanborn I,
 
 and there is no other (preserved) ground on which Kent or CPC can upset the state’s determination. The district court therefore should have entered judgment for rent from November 1, 1983, at the rate of $2,025 per year.
 

 The judgment is reversed, and the case is remanded with instructions to enter judgment for CPC in the amount of $2,025 per year from November 1, 1983, to date, plus appropriate interest, and in the amount of $1,603.10, plus interest from March 1,1983, to date, for the period prior to November 1, 1983. Costs to Sanborn.