**In re O'NEIL VILLAGE PERSONAL CARE CORPORATION t/d/b/a Glenshire Woods, Debtor.**

**Bankruptcy No. 88–1273.**

United States Bankruptcy Court, W.D. Pennsylvania.

June 24, 1988.

John M. Silvestri, Pittsburgh, Pa.

George S. Gobel, Liddle & Adams, McKeesport, Pa., for Silvestri/Receiver.

Michael C. Pribanic, Pribanic & Pribanic, P.C., McKeesport, Pa., for debtor.

Edward J. Osterman, Eddy & Osterman, Pittsburgh, Pa., for the McKays.

Kathleen Robb–Singer, Office of the U.S. Trustee, Pittsburgh, Pa.

## MEMORANDUM OPINION

BERNARD MARKOVITZ, Bankruptcy Judge.

Before the Court are numerous Motions and an Adversary proceeding related to the above-captioned Debtor, to-wit:

1. Rescheduled Rule to Show Cause Why Case Should Not Be Dismissed For Failure to Complete Filing;

2. Motion to Dismiss Under 11 U.S.C. § 305, filed by John M. Silvestri, State Court Receiver;

3. Motion to Convert to Chapter 7 or to Appoint a Chapter 11 Trustee, filed by Howard J. Berman and Barbara Berman;

4. Emergency Motion to Compel Turnover of Property to the Estate, filed by the Debtor; and

5. Motion for Temporary Restraining Order and Preliminary Injunction, filed by the State Court Receiver.

A hearing was held on June 14, 1988, regarding the Motion to Dismiss Under 11 U.S.C. § 305, wherein testimony was taken. As it is clear to this Court that this filing occurred merely to avoid the justice being meted out in the state courts, we will abstain from hearing these matters, and will dismiss this bankruptcy case, returning the parties to their relative positions in the state court actions.

## FACTS

Debtor is a corporation whose business is the operation of a personal care facility called Glenshire Woods. Initially, the corporate shareholders were William P. Deemer ("Deemer"), Michael H. Egerer ("Egerer"), and Ronald J. McKay ("McKay"). Deemer and Egerer each owned thirty per-

cent (30%) of the stock, and McKay owned forty percent (40%). Edward J. Osterman, Esq. ("Osterman"), was corporate counsel, secretary, and a director from December 1986 through his resignation on May 21, 1988. Osterman avers no knowledge of the whereabouts of the corporate minute book and ledger, although he was served with a subpoena and order for production of records on May 19, 1988, while still serving in his corporate capacities.

On November 4, 1986 McKay entered into a Declaration of Trust with Ms. Constance Lauris, and received in excess of $240,000.00 from Ms. Lauris. McKay acknowledges receipt of $170,000.00 which he was to invest *on her behalf.*

Less than two (2) weeks later, McKay and Walter E. Manns, Jr. ("Manns") entered into a partnership agreement on November 16, 1986, forming the O'Neill Interim Funding Group ("IFG"), to secure equity capital funding for Glenshire Woods. McKay contributed $175,000.00 and Manns contributed $180,000.00 to said partnership.[1] In addition, Manns secured a letter of credit in the amount of $235,000.00, for which he pledged stocks as collateral. Said letter of credit was assigned to the IFG. The partnership agreement called for McKay to release Manns' collateral with deposits of $150,000.00 on January 1, 1987, and $85,000.00 on March 1, 1987. Osterman served as the escrow agent for the IFG and as Manns' counsel, encouraging Manns to invest in Glenshire Woods.

On December 16, 1986 Manns and McKay, through the IFG, and the Debtor's shareholders (Deemer, Egerer, and McKay) entered into a loan agreement and note wherein IFG loaned all of its assets ($355,-000.00 cash and $235,000.00 letter of credit) to the Debtor in return for a collateral pledge of all of Debtor's stock. Said stock was held by Osterman; however, no notation of encumbrances was ever placed on the share certificates. As of said date, Osterman was serving as counsel to the Debtor corporation, and counsel to Manns,

a substantial creditor of the Debtor, as well as acting as IFG's escrow agent.

During the period May 20, 1987 through September 29, 1987, three (3) checks, totaling $30,000.00 were drawn on the Debtor corporation, to the order of Michael Egerer, the purpose for same being the corporate repurchase of his shares. At that point, Egerer's shares were split between McKay and Deemer, making McKay sixty percent (60%) owner and Deemer forty percent (40%) owner. No evidence was offered to show that McKay and Deemer paid for said shares.

On April 13, 1988, in the case of *Lauris v. Lauris,* Judge Kaplan of the Court of Common Pleas of Allegheny County entered a Consent Order, wherein Ronald and Maralyn McKay ("Maralyn") agreed that neither "... shall alienate, transfer, hypothecate, pledge, sell or in any other fashion otherwise encumber any of their holdings." Osterman, serving as counsel to the Debtor and to Manns, now added McKay as a client, and allowed McKay to execute said Consent Order; additionally acting as "courier" in obtaining Maralyn's signature.

On April 19, 1988 Judge Kaplan entered a further Order, finding McKay liable for breaching his fiduciary duty to Constance Lauris, having admitted to converting $170,000.00 for his own use. Further, the court imposed a constructive trust in Lauris' favor against all of the interests and assets of McKay, Maralyn, the Debtor, and any other corporation, partnership, or joint venture in which McKay had an interest and to which said sum may have been diverted. Previously in this case, on March 29, 1988, Judge Kaplan had directed McKay to make a full financial disclosure of assets and liabilities. In said disclosure, McKay listed his then 60% ownership of Debtor, with no indication of any encumbrance, including the loan agreement with IFG. Osterman, who was both McKay's counsel and the escrow agent holding said pledged shares for IFG, advised neither the

---

[1]. Clearly this was not an investment by McKay on behalf of Ms. Lauris. He invested $175,-000.00 in his name only, giving no party any indication that he invested $170,000.00 of said

sum as trustee for another. In fact, McKay later admitted to the conversion of this $170,-000.00 for his own benefit and use. *See Lauris v. Lauris, infra.*

Court nor opposing counsel of the pledge encumbrance. To the contrary; in his testimony in this Court counsel opined that these Orders were entered without the state court having jurisdiction and therefore, he reasoned compliance with same was not mandated. Apparently counsel had determined, at or about the time of the entry of the Orders, that he would not advise his client and/or clients to abide by these Orders, even though no appellate court had either vacated same, or decided that voluntary submission to a court's jurisdiction did not in fact grant said court jurisdiction.

On April 14, 1988 in the case of *Berman v. McKay et al.*, Judge Horgos of the Court of Common Pleas of Allegheny County entered an *ex parte* Order appointing John M. Silvestri, Esq. ("Silvestri") as the receiver over the assets and property of the Debtor. Thereafter, Judge Horgos conducted three (3) full days of hearings, culminating in the entry of an Order on April 21, 1988, continuing the receivership and requiring the posting of a bond.

Thereafter, in the *Estate of Kathryn A. Kincaid*, Judge Zavarella of the Court of Common Pleas of Allegheny County entered an Order on May 2, 1988, finding that McKay breached his fiduciary duty to the estate as executor, by converting $203,876.24 to his own benefit, and by paying himself an executor's fee of $18,700.00. Judge Zavarella further Ordered the imposition of a constructive trust upon the assets of McKay and Maralyn, and upon any of their interest in any corporation, partnership or joint venture, including the Debtor.

On the morning of May 6, 1988, Silvestri sought and received authority from Judge Horgos to hire Outlook Healthcare, Inc. ("Outlook") as the professional management team to operate Glenshire Woods on a day-to-day basis. When Outlook attempted to take over the administration, they were verbally accosted and threatened by McKay; Outlook departed the premises and refused to return unless McKay was barred from the property.

That same afternoon, individuals whose authority to act is clearly in question, caused the Debtor to file a Chapter 11 bankruptcy petition. While the prior officers admit to having had a meeting relating to this issue, no corporate resolution affirming the bankruptcy filing has been provided, nor has the absence of same been explained. Interestingly however, on prior occasions when the corporate insiders took significant corporate action, they did so by way of a *written* corporate resolution.

On May 11, 1988 Judge Horgos imposed a constructive trust, directed to the individual principals of the debtor-in-possession and not the debtor-in-possession, in favor of Mr. and Mrs. Berman upon all of the interest and assets of said principals, including their rights in any corporation, partnership or joint venture in which either party has an interest, including the Debtor. Also on May 11, 1988, in the case of *Lauris v. McKay*, Judge Horgos entered an Order appointing Silvestri as receiver, with control over all of the assets and property of the Debtor, McKay, and Maralyn. Judge Horgos' Order further stated that he would confer with Judge Kaplan to provide for the orderly administration of these cases. Finally, on that same date, Judge Horgos enjoined McKay and Maralyn from the premises of Glenshire Woods, requiring that they turn over the keys to the facility to Silvestri. The Order allowed for enforcement of same by the Sheriff. Thereafter, Outlook returned to the facility.[2]

On May 21, 1988, in direct defiance of the aforementioned state court constructive trust orders, a stock transfer, akin to the magical "shell game" occurred, leaving McKay with forty-nine percent (49%) of the stock and Walter and Eleanor Manns owning fifty-one percent (51%) of the Debtor. In fact, a majority of the Debtor's Board of Directors (Maralyn, Osterman, and McKay) transferred the Debtor's stock to the IFG

---

**2.** In fact, Outlook was "hired" by Manns, after he assumed controlling ownership of Glenshire Woods, for the period May 31, 1988 through June 17, 1988.

(McKay and Manns), based upon the IFG declaration of default on Debtor's loan.[3]

From the time of his appointment through the days prior to the bankruptcy filing, Silvestri found substantial problems in the Debtor's financial affairs, including:

1) lack of accounts payable and accounts receivable ledgers, making it extremely difficult to determine Debtor's financial health;

2) default on a HUD mortgage, which Silvestri was unable to pay because he was unable to draw against the letter of credit;

3) lack of workers' compensation, liability and employee fidelity insurance policies, as required by HUD regulations;

4) misappropriation of over $11,000 in resident security deposits, by commingling same in the Debtor's operating account and thereafter causing their disbursement;

5) depletion of $29,470.00 in operating funds through payments made, by check, to "Ronald J. McKay" or "Cash";

6) depletion of $81,806.90 in operating funds to Manns as payments made on Manns' note to the Debtor, same being insider payments;

7) repurchase and distribution of Michael Egerer's shares from corporate funds in the amount of $30,000.00 to insiders without proof of payment for same; and

8) permission for Alyce Clark, Maralyn McKay's mother, to live at Glenshire Woods for approximately eight months without collection of monthly rent, having a value of $16,292.46.

Under Silvestri's supervision, a professional manager has been engaged, binders are being sought for the necessary insurance coverage, total payroll dollars have been reduced, and a creditors' work-out arrangement has been substantially formulated to repay all past due vendors.

Specifically, Outlook is in place, operating Glenshire Woods on a per diem basis under court order. Silvestri has sought workers' compensation insurance; as of the date of our hearing, no insurance of any type was yet in place, however, binders were being sought. In order to reduce the payroll, he terminated two (2) administrators and two (2) personal care staff members: while removing only four (4) of the Center's twenty (20) plus employees, Silvestri reduced payroll by over twenty percent (20%). Such a move, along with an anticipated increase in faculty census, substantial additional cuts, and an anticipated sum of funding from HUD, will allow the State Court receiver to repay all arrearages, and put Glenshire Woods in a positive monthly cash flow.

## ANALYSIS

■ Section 305 of the Bankruptcy Code states in pertinent part:

(a) The Court, after notice and a hearing, may dismiss a case under this title, or may suspend all proceedings in a case under this title, at anytime if—

(1) the interests of creditors and the debtor would be better served by such dismissal or suspension.

The decision to dismiss under § 305 is discretionary, and must be made on a case-by-case basis. *In re Bailey's Beauticians Supply Co.*, 671 F.2d 1063 (7th Cir.1982); *In re Business Information Co., Inc.*, 81 B.R. 382 (Bankr.W.D.Pa.1988); *Matter of Fitzgerald Group*, 38 B.R. 16 (Bankr.S.D. N.Y.1983); *In re International House of Pancakes*, 22 B.R. 926 (Bankr.N.D.Ill. 1982).

The key issue in determining the propriety of a § 305 dismissal is whether it will serve the best interests of both the Debtor *and* the creditors. *In re Business Information Co., Inc., supra; In re Safon Ochart*, 74 B.R. 131 (Bankr.D.P.R.1986); *In re Cooper Properties Liquidating Trust, Inc.*, 61 B.R. 531 (Bankr.W.D.Tenn.1986); *In re Donaldson Ford, Inc.*, 19 B.R. 425

---

**3.** The principals of the debtor-in-possession offered no evidence as to nature of the default. However, it does appear curious that the IFG and Debtor representatives are in many respects identical and could easily create or manufacture a default at any given time.

(Bankr.Ohio 1982); *In re Michael S. Starbuck, Inc.*, 14 B.R. 134 (Bankr.S.D.N.Y. 1981).

Several courts have held that § 305 abstention or dismissal is appropriate when another forum is available to determine the parties' interests, and in fact, such an action has been commenced. *In re Business Information Co., Inc., supra; Matter of Onyx Records, Inc.*, 42 B.R. 156 (Bankr.N.Y.1984); *In re Mineral Hill Corporation,* 16 B.R. 687 (Bankr.D.Md.1982); *In re Michael S. Starbuck, Inc., supra; In re Sun World Broadcaster, Inc.*, 5 B.R. 719 (Bankr.M.D.Fla.1980).

Still other courts have stated that economy and efficiency of administration must be key considerations in the abstention decision. *In re Business Information Co. Inc., supra; In re Safon Ochart, supra; In re Deacon Plastics Machine, Inc.*, 49 B.R. 982 (Bankr.D.Mass.1985); *In re International House of Pancakes, supra; In re Sun World Broadcasters, Inc., supra.*

As § 305(c) provides that an Order under this section is not reviewable by appeal or otherwise, courts generally, and this Court specifically, only grant this type relief in an egregious situation.

 In the case at bar we have a state court-appointed receiver who is supervising the operation and management of the Debtor. The receiver has hired professional management to restore administrative stability for the facility, is arranging for some of the necessary insurance to be put in place, and is working with the new management team to provide a financial workout of all of the Debtor's past-due accounts. Silvestri is performing these activities under the watchful eye of three highly experienced and well qualified members of the state court.

It is clear from the testimony that this Court could not and would not return management of the debtor-in-possession to its principals, the McKays or Manns. McKay has admitted civil liability for conversion, and may, in fact be criminally liable as well. He has proven himself to be incapable of holding a position of authority, requiring any degree of fiduciary trust.

The testimony provided by Manns is, at best, incredible; he has been a key party to many of the strategical and financial maneuverings between IFG and the Debtor as previously discussed. If in fact he had no knowledge of these stock transactions, as he asserts, this Court would consider it foolhardy to place such an incompetent individual in control of a facility whose purpose is to protect and care for the infirm.

If this Court retained jurisdiction, a trustee would be appointed to supervise the operation and management of the Debtor. Professional management would be hired (or retained) to restore administrative stability, insurance policies would be procured to cover the facility and its employees, and the trustee would propose a Chapter 11 Plan of Reorganization, in all likelihood involving the sale of the facility. Silvestri, the receiver, has not been approved as a member of the Bankruptcy Trustee Panel, and therefore would not be retained as such. A new party would be appointed and would be required to begin again what Silvestri has already accomplished.

This is as clear a case of duplicative effort as this Court can imagine. Certainly, this scenario would not provide for the economic and efficient administration of the estate. This case is already under the control of the receiver, appointed and monitored by the learned state court judges. The Debtor is in much better hands than it would be if control were returned to McKay and/or Manns. The work-out arrangement, already in motion, will provide an appropriate payment to the general creditors, as well as maintain protection for Ms. Lauris, the Bermans, and the Kincaid estate. This Court will not interfere with what appears to be a very workable situation.

An appropriate Order will be issued.