**In re 801 SOUTH WELLS STREET LIMITED PARTNERSHIP,**
Debtor.

**Bankruptcy No. 95 B 21193.**

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

March 1, 1996.

---

Steven R. Towbin and Stephen T. Bobo, D'Ancona & Pflaum, Chicago, IL, for Debtor.

C. Steven Tomashefsky, Timothy Chorvat, Jenner & Block, Chicago, IL, for 801 Associates, a creditor.

Michael Levinson, Gus A. Paloian, Seyfarth, Shaw, Fairweather & Geraldson, for LW–SP2, L.P., first mortgagee.

## MEMORANDUM OPINION

ERWIN I. KATZ, Bankruptcy Judge.

This case presents the question of whether the Court, in an involuntary proceeding under § 303, should retain jurisdiction to resolve a dispute between junior and senior mortgagees over the entrepreneurial opportunity to redevelop the Debtor's sole asset, an apartment building. Resolution of the dispute will not affect either the Debtor or the estate, since the Debtor has stipulated that it has no equity in the building and no intent to reorganize. There are no unsecured creditors except for the Debtor's principals.

This matter is before the Court on the Motions of Secured Creditor LW–SP2 ("LW") and 801 South Wells Street Limited Partnership ("Debtor") for dismissal of this involuntary bankruptcy proceeding pursuant to 11 U.S.C. § 1112(b), or for abstention pursuant to § 305(a). The Court makes the following Findings of Fact and Conclusions of Law.

## I. FINDINGS OF FACT

1. The property located at 801 South Wells Street, Chicago, Illinois ("Property"), is a ten-story loft apartment building with 99 rentable units. The Property was built in 1912 for industrial use and was remodeled into apartment units in 1989. It is located just south of the Chicago Loop and is west of Printers Row.

2. Debtor holds title to the Property through an Illinois land trust. The Property is encumbered by three mortgages:

(a) The First Mortgage is currently held and owned by LW as the assignee. It is dated August 29, 1989, and serves as collateral for notes in the original aggregate principal amount of $9.2 million, with Enterprise Savings Bank as the original mortgagee;

(b) The Second Mortgage is currently held and owned by Wells Street Corporation ("WSC") as the assignee. It is a wraparound mortgage, security agreement, and assignment of rents dated May 30, 1984, and serves as collateral for a note in the original principal amount of $1.6 million, with Ben Franklin Savings as the original mortgagee; and

(c) The Third Mortgage is currently held and owned by 801 Associates Limited Partnership ("Associates"). It is a purchase money wraparound mortgage, security agreement, and assignment of rents dated August 29, 1989, and serves as collateral for a note in the original principal amount of $1.9 million.

3. All three mortgages are non-recourse.

4. The Property is the Debtor's only significant asset.

5. On August 29, 1989, WSC's predecessor, Ben Franklin Financial Corp., entered into a Mortgage Subordination Agreement with Enterprise Savings Bank. Paragraph 11 of the WSC Mortgage Subordination Agreement provides:

So long as the First Mortgage shall remain a lien against the Premises or any part thereof, the Subordinating Lender and any other holder of the Junior Mortgage shall not collect or cause a receiver to collect any of the rents, issues or profits of the premises.

The "First Mortgage" is identified in the Agreement as the original Enterprise mortgage, which is the First Mortgage now held by LW. "Subordinating lender" is defined on page 1 of the Agreement as WSC.

6. On August 29, 1989, Associates entered into a separate Mortgage Subordination Agreement with Enterprise Savings Bank. Paragraph 11 of the Associates Mortgage Subordination Agreement provides:

So long as the First Mortgage shall remain a lien against the Premises or any part thereof, the Subordinating lender and any other holder of the Junior Mortgage shall not collect or cause a receiver to collect any of the rents, issues or profits of the premises.

The "First Mortgage" is identified in the Agreement as the original Enterprise mortgage, which is the First Mortgage now held by LW. "Subordinating Lender" is defined on page 1 of the Agreement as Associates.

7. On August 29, 1989, Associates entered into a Inter–Creditor Agreement with Enterprise Savings Bank. Paragraph 5 of the Inter–Creditor Agreement provides:

In consideration of the agreement of Enterprise as set forth herein, Associates, on behalf of itself and its successors and assigns and any other legal holder of the Second Note and Second Mortgage, does hereby irrevocably waive the right to assert any defense to the foreclosure by Enterprise of the lien of the First Mortgage or the exercise of any other remedies available to Enterprise under the Loan Documents or otherwise.

The "Second Note and Second Mortgage" are defined on page 1 of the Agreement as the Associates Note and Mortgage. The "First Mortgage" is defined on page 1 of the Agreement as the Enterprise Mortgage, which is the First Mortgage now held by LW.

8. The LW Mortgage, the Associates Mortgage, and the WSC Mortgage are all in default. In September of 1993, WSC's predecessor commenced a foreclosure proceeding in the Circuit Court of Cook County, Illinois. In April of 1994, LW filed a counterclaim to foreclose its First Mortgage.

9. Upon LW's motion, the state court appointed a receiver to manage the Property and collect the rents. Pursuant to an agreed order entered by this Court, the receiver continues to operate the Property. The receiver paid, and managed to keep current, the Debtor's obligations stemming from operation of the Property.

10. On October 3, 1994, the Circuit Court of Cook County granted a partial Summary Judgement in favor of LW in the foreclosure action against WSC on the issue of the priority of LW's mortgage.

11. On July 25, 1995, the Circuit Court of Cook County granted a partial Summary Judgement in favor of LW in the foreclosure action against Associates on the priority of LW's mortgage.

12. On October 6, 1995, before a final judgment was entered by the Circuit Court in the foreclosure proceeding, Associates and WSC filed an involuntary bankruptcy petition. This Court, *sua sponte*, entered an order for relief on January 9, 1996.

13. On November 20, 1995, Associates and WSC filed a Joint Plan of Reorganization and Disclosure Statement. On November 28, 1995, the proponents filed an Amended Plan of Reorganization and Amended Disclosure Statement. The Plan proposes, subject to conditions precedent, to convert the Property into condominium units which will be sold to the public. The Debtor's interest would be extinguished and replaced by an entity to be created and controlled by WSC and Associates. This entity would reap the financial rewards of the condominium sales after conversion.

14. Debtor's Schedule D lists the following secured creditors: LW, Associates, WSC, and the Cook County Collector ("County"). The County is a secured creditor for real estate taxes which, as a matter of Illinois law, have priority and will be paid out of the proceeds of any foreclosure sale. *See* Ill. Ann.Stat. ch. 110, ¶ 15–1512(b)(Smith–Hurd 1984 & Supp.1992). Debtor's Schedule F lists the following unsecured creditors: Marshall Bennett Enterprises, Williams Realty Co., Marshall Bennett, Emory Williams, Jr., and Thomas Snitzer. All of the unsecured creditors are insiders and equity holders of the Debtor, with the possible exception of Mr. Snitzer who is a former insider.

15. Although the amount of LW's mortgage indebtedness has not yet been determined by the Circuit Court of Cook County in the foreclosure action, all parties agree that LW is undersecured.

16. Debtor stipulated at the hearing that it possesses no equity interest in the Property and has no intent to reorganize.

17. LW, the Debtor, and all of the unsecured creditors favor abstention and dismissal.

## II. CONCLUSIONS OF LAW

### A. § 305(a) Abstention

■ Pursuant to § 305(a) of the Code, "[t]he court, after notice and hearing, may dismiss a case under this title, or may suspend all proceedings in a case under this title, at any time if—(1) the interest of the creditors and the debtor would be better served by such dismissal or suspension." 11 U.S.C. § 305(a) (1993 & Supp.1995). In determining whether abstention under § 305(a) is appropriate, courts must look to the facts of the individual cases. *In re Fitzgerald Group*, 38 B.R. 16, 17 (Bankr.S.D.N.Y.1983); *In re Artists' Outlet, Inc.*, 25 B.R. 231, 232 (Bankr.D.Mass.1982). The legislative history states that abstention is appropriate when,

> an arrangement is being worked out by creditors and the debtor out of court, there is no prejudice to the rights of creditors in that arrangement, and an involuntary case has been commenced by a few recalcitrant creditors to provide a basis for future threats to exact full payment.

H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 325 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6281.

Some courts interpret this language as a limiting legislative directive, and utilize a three-prong test authorizing abstention only when (1) the petition was filed by a few recalcitrant creditors and most creditors oppose the bankruptcy; (2) there is a state insolvency proceeding or an out-of-court arrangement pending; and (3) dismissal is in the best interest of the debtor and all creditors. *See In re Grigoli*, 151 B.R. 314, 319 (Bankr.E.D.N.Y.1993); *In re Trina Assoc.*,

128 B.R. 858, 867 (Bankr.E.D.N.Y.1991); *In re Sherwood Enterprises, Inc.*, 112 B.R. 165, 167–68 (Bankr.S.D.Tex.1989); *In re RAI Marketing Services, Inc.*, 20 B.R. 943, 946 (Bankr.D.Kan.1982).

Other courts look to a number of established criteria in determining whether abstention would "better serve" the interests of the debtor and creditors. These factors include (1) economy and efficiency of administration; (2) whether another forum is available to protect the interests of both parties or there is already a pending proceeding in state court; (3) whether federal proceedings are necessary to reach a just and equitable solution; (4) whether there is an alternative means of achieving an equitable distribution of assets; (5) whether the debtor and the creditors are able to work out a less expensive out-of-court arrangement which better serves all interests in the case; (6) whether a non-federal insolvency has proceeded so far in those proceedings that it would be costly and time consuming to start afresh with the federal bankruptcy process; and (7) the purpose for which bankruptcy jurisdiction has been sought. *In re Fax Station, Inc.*, 118 B.R. 176, 177 (Bankr.D.R.I.1990). *See also In re Artists' Outlet, Inc.*, 25 B.R. at 233 (citing cases); *In re Win–Sum Sports, Inc.*, 14 B.R. 389, 394 (Bankr.D.Conn.1981).

This Court believes that application of the latter multi-factored analysis better serves Congress' intent in determining whether abstention is appropriate under § 305(a). Had Congress intended the illustrative example in the legislative history to limit the factual scenarios under which abstention is authorized, it would have included such language in § 305(a) itself.[1]

### 1. Availability of an alternative forum

■ In determining whether abstention is in the best interests of the debtor and all creditors, courts have considered "whether another forum is available to protect the interest of [the] parties or there is already a

---

1. WSC and Associates argue that abstention is inappropriate unless it would benefit *all* of the estate's creditors. But the previously detailed example in the legislative history proves this to be untrue. At the very least, abstention need not benefit creditors who commence an involuntary case without a legitimate purpose under the Code, so as to obtain a greater return than they would have received outside of bankruptcy.

pending proceeding in state court." *In re Fax Station, Inc.*, 118 B.R. at 177. However, "another forum" cannot be construed to mean a state insolvency proceeding, since with the exception of entities not authorized to be debtors under § 109(b) of the Code, state insolvency laws are suspended while the federal Bankruptcy Code is in effect. *Sturges v. Crowninshield*, 17 U.S. (4 Wheat) 122, 196–200, 4 L.Ed. 529 (1819).

■ A suitable alternative forum will be deemed to exist if in that forum "there are pending arrangements that will equitably satisfy the creditors and not be unduly burdensome or prejudicial to the debtor," so that continuation of the bankruptcy proceeding will be "duplicitous and uneconomical." *In re RAI Marketing Services, Inc.*, 20 B.R. 943, 946 (Bankr.D.Kan.1982). Bankruptcy courts have determined that alternative forums exist when a matter is pending in state court which will affect whether the bankruptcy reorganization is necessary, *In re Realty Trust Corp.*, 143 B.R. 920, 927 (D.N.Mar.I. 1992); *In re Nahas*, 95 B.R. 387, 388 (Bankr. W.D.Pa.1989); *In re A & D Care, Inc.*, 90 B.R. 138, 142 (Bankr.W.D.Pa.1988), when the debtor has been in receivership for so long that the bankruptcy would be duplicative and wasteful to the progress already made, *In re O'Neil Village Personal Care Corp.*, 88 B.R. 76, 80 (Bankr.W.D.Pa.1988); *In re Michael Starbuck, Inc.*, 14 B.R. 134, 135 (Bankr. S.D.N.Y.1981); *In re Sun World Broadcasters, Inc.*, 5 B.R. 719, 721–22 (Bankr.M.D.Fla. 1980), when state court provides a more efficient machinery for the wind-up of debtor-partnerships, *In re Williamsburg Suites, Ltd.*, 117 B.R. 216, 220 (Bankr.E.D.Va.1990); and when confronted by intrapartnership/company disputes over the ownership or control of the debtor, *In re Runaway II, Inc.*, 168 B.R. 193, 198 (Bankr.W.D.Mo.1994); *In re ABQ–MCB Joint Venture*, 153 B.R. 338, 341 (Bankr.D.N.M.1993); *In re Fax Station, Inc.*, 118 B.R. at 178; *In re Beacon Reef Limited Partnership*, 43 B.R. 644, 646–47 (Bankr.S.D.Fla.1984).

■ Under 28 U.S.C. § 157(c)(1), a bankruptcy court must decline jurisdiction in favor of an alternative forum when confronted by non-core proceedings which are not "re-lated to" the Chapter 11 case. In *In re Xonics*, 813 F.2d 127 (7th Cir.1989), the Seventh Circuit held that within the context of 28 U.S.C. § 157(c)(1), disputes among creditors of a bankrupt fall within bankruptcy court jurisdiction only if they involve property of the estate, or if resolution of two creditors' intramural dispute will affect the recovery of some other creditor. *Id.* at 131. *See also In re Kubly*, 818 F.2d 643, 645 (7th Cir.1987); *In re Kilgus*, 811 F.2d 1112, 1117–18 (7th Cir.1987); *In re Chicago, Rock Island & Pacific Railroad*, 794 F.2d 1182, 1187–88 (7th Cir.1986). In arriving at this conclusion, the *Xonics* Court posed the following hypothetical and solution:

> Suppose A, B, and C claim interests in a pool of oil. If A is a bankrupt, ... [and] if the estate should disclaim any interest in the pool, only the dispute between B and C would remain. The resolution of that dispute would not affect the creditors of the bankrupt, and there would be no source of jurisdiction. That B and C might also be creditors of the bankrupt would not enlarge the court's power; there is no jurisdiction to resolve all disputes among creditors of a bankrupt. There is jurisdiction under § 157(c)(1) only when the dispute is "related to" the bankruptcy—meaning that it affects the amount of property available for distribution or the allocation of property among creditors.

*In re Xonics*, 813 F.2d at 127.

The principles promulgated by the *Xonics* Court in determining jurisdiction under 28 U.S.C. § 157(c)(1) should be afforded weight in determining whether abstention is appropriate under § 305(a) of the Code. Thus, when a debtor disclaims any interest in the sole property of the estate, and that property is the subject of a dispute between creditors, resolution of which will not affect the collection of other creditors through the estate, it is appropriate for the bankruptcy court to abstain from exercising jurisdiction.

In the case at bar, although the Debtor has not formally abandoned the Property pursuant to § 554 of the Code, it has basically committed a *de facto* abandonment by disclaiming any equity in the building, and by

representing to the Court its intent not to reorganize.

It is apparent that the bankruptcy was precipitated by, and continues to exist solely as, a dispute between the second and third mortgagees and the first mortgagee over the opportunity to develop the Property and capture any upside that the future may bring.[2] The involuntary petition was filed by WSC and Associates only after partial summary judgements were entered against them in the state court foreclosure proceedings. The representative of both WSC and Associates testified that filing of the involuntary petition "was the only way to protect the investment of WSC and Associates," and that it provided "a chance at recovering some of the real money they have into [sic] the deal." Testimony of Michael Mollod.

Furthermore, resolution of the dispute has no bearing on the recovery of other creditors. As a result of the receiver's payment of obligations on an ongoing basis, no unsecured creditors exist with claims against the estate. The only additional creditors are the Cook County Collector, with a secured claim for outstanding real estate taxes, and certain unsecured insiders of the Debtor. Were LW to obtain possession of the Property by virtue of its foreclosure, under state law the County would be paid in full with the sale proceeds, *see* Ill.Ann.Stat. ch 110, para. 15–1512(b), and the unsecured insiders would receive nothing. Likewise, were the principals of WSC and Associates to gain control of the Property upon confirmation of their Plan of Reorganization, the County would be paid in full, and the unsecured creditors would once again receive nothing.

When neither the debtor nor the estate possess an ·interest in the sole property of the bankruptcy, and that property is the subject of a foreclosure proceeding and an inter-creditor dispute in state court, that proceeding is an appropriate alternative forum for equitable resolution of the dispute. Consequently, retention of jurisdiction in the instant matter with its attendant administrative expenses would be uneconomical.

**2.** It should be noted that LW has represented that it is willing to allow the Property to be sold in this proceeding so long as it is permitted to

*2. Absence of bankruptcy purpose*

Another factor considered by courts in determining whether abstention is appropriate is "the purpose for which bankruptcy jurisdiction has been sought." *In re Fax Station, Inc.*, 118 B.R. at 177. The central purpose of the Bankruptcy Code "is to provide a procedure by which certain insolvent debtors can reorder their affairs, make peace with their creditors, and enjoy a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt." *Grogan v. Garner*, 498 U.S. 279, 286, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991). This "fresh start" objective is counterbalanced by the Code's policy of ensuring equal and equitable treatment of all creditors. *United States v. Goodstein*, 883 F.2d 1362, 1370 (7th Cir.1989).

In a Chapter 11 reorganization, the "fresh start" policy is sought to be accomplished through preservation of the going concern value of the debtor's business. The 1977 House Report accompanying enactment of the Code states,

> [t]he purpose of a business reorganization case, unlike a liquidation case, is to restructure a business' finances so that it may continue to operate, provide its employees with jobs, pay its creditors, and produce a return for its stockholders. The premise of a business reorganization is that assets that are used for production in the industry for which they were designed are more valuable than those same assets sold for scrap.

H.R.Rep. No. 595, 95th Cong., 1st Sess. 220 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6179.

It is appropriate for a creditor to file an involuntary petition to prevent the debtor from making preferential payments to favored creditors, or to stop the "race to the courthouse" by creditors who wish to advantage themselves by levying on the debtor's assets. However, use of an involuntary

credit bid the value of the Property at the sale. That invitation was declined by WSC and Associates.

bankruptcy to obtain a disproportionate advantage to that particular creditor's position, rather than to protect against other creditors obtaining such a disproportionate advantage is improper. *In re Better Care, Ltd.,* 97 B.R. 405, 410 (Bankr.N.D.Ill.1989).

■ Involuntary bankruptcies also may be utilized to achieve greater "creditor democracy" in the bankruptcy process, by allowing creditors to play a more proactive role in the case through the proposal of their own plans of reorganization. *See In re Mother Hubbard, Inc.,* 152 B.R. 189, 195 (Bankr. W.D.Mich.1993) (stating that § 1121(c) limits on the debtor's exclusivity period encourages the filing of competing plans by creditors and fosters "creditor democracy").

The policy of equality and equity among creditors only ensures that *similarly situated creditors* will be treated equally. *See Matter of Great Northern Forest Products, Inc.,* 135 B.R. 46, 67 (Bankr.W.D.Mich.1991). The Code establishes different classes of creditors with different respective rights. Secured creditors receive priority treatment for their claims to the extent of the value of their collateral. 11 U.S.C. § 506(a). Creditors with administrative claims in Chapter 11 must receive cash equal to the allowed amount of the their claim on the effective date of the plan. 11 U.S.C. § 1129(a)(9)(A). Unsecured creditors are paid last on a pro-rata basis along with claims similarly classified under § 726(a) of the Code. 11 U.S.C. § 726(b).

■ None of these purposes are implicated in the instant bankruptcy. Debtor has acknowledged that it has no intent to reorganize and take advantage of the "fresh start" policy of the Code. In light of the absence of unsecured creditors or Debtor equity in the Property the filing does nothing to ensure equity and equality among unsecured creditors. Equal and equitable treatment among the secured creditors was afforded by the state court in its determinations as to the relative priority of their liens. Indeed, the secured parties ensured their own equitable treatment by virtue of the subordination and

inter-creditor agreements into which they entered. Furthermore, filing of the involuntary petition by the second and third mortgagees does nothing to serve the purposes behind Code authorization for creditor initiated bankruptcies. There is simply no need for "creditor democracy" and a greater say in the reorganization when the Debtor does not intend to reorganize.

In sum, retention of jurisdiction in this case would vindicate none of the policies for which the Bankruptcy Code was enacted, and only serve to compromise the statute's integrity while adding new grist to the mill of its critics.

■ The Court acknowledges that abstention under § 305(a) is an extraordinary remedy, and does not undertake its consideration of the matter lightly. *See In re Luftek, Inc.,* 6 B.R. 539, 548 (Bankr.E.D.N.Y.1980) ("There is an inherent risk to our system of jurisprudence in any Act of Congress which gives the court such broad powers to refuse jurisdiction over a case.") In this case, however, the foreclosure proceedings await only a final order, neither the debtor nor the unsecured creditors have an interest in the property, and no bankruptcy purpose is served by retention of jurisdiction. This is the extraordinary case in which abstention is warranted.[3]

### B. § 1112(b) Dismissal

■ Under § 1112(b) of the Code "the court ... may dismiss a case under this chapter ... for cause." 11 U.S.C. § 1112(b). Section § 1112(b) sets forth ten independent grounds for dismissal. However, as indicated in the Congressional reports,

> [t]he list is not exhaustive. The Court will be able to consider other factors as they arise, and to use its equitable powers to reach an appropriate result in individual cases.

H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 405 (1977); S.Rep. No. 95–989, 95th Cong., 2d Sess. 117 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5903, 6361.

---

**3.** Although it was argued that abstention is appropriate since no plan could be confirmed due to subordination and inter-creditor agreements

governing the mortgagees' relationship, these are confirmation issues and will not be addressed in the instant motion.

Thus, courts have dismissed Chapter 11 cases pursuant to § 1112(b) on the grounds that they were filed in bad-faith. *See In re Little Creek Development Co.,* 779 F.2d 1068, 1072 n. 2 (5th Cir.1980) (citing cases); *In re HBA East, Inc.,* 87 B.R. 248, 258–62 (Bankr. E.D.N.Y.1988) (citing cases).

In determining whether a petition has been filed in bad-faith, the court is "primarily concerned with the underlying question of whether reorganization is the proper course of action in a particular ... case." *In re Mandalay Shores Cooperative Housing Assoc.,* 63 B.R. 842, 848 (N.D.Ill. 1986). Courts have utilized circumstantial factors which have been identified in bad-faith filings when considering § 1112(b) dismissals. In *In re East–West Assoc.,* 106 B.R. 767 (Bankr.S.D.N.Y.1989), the court considered the following bad-faith indicia in disposing of a § 1112(b) motion to dismiss an involuntary petition: (1) the debtor has only one asset, the property; (2) the debtor has few unsecured creditors whose claims are small in relation to the claims of the secured creditors; (3) the debtor has few employees; (4) the property is the subject of a foreclosure action as a result of arrearages on the debt; (5) the timing of the ... filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights. *Id.* at 771–72. *See In re McCormick Road Assoc.,* 127 B.R. 410, 413 (N.D.Ill.1991), *citing In re Phoenix Piccadilly Ltd.,* 849 F.2d 1393, 1394–95 (11th Cir.1988).

However, "these factors are among many items which the court must consider in light of the totality of the circumstances surrounding each bankruptcy case." *In re Cadwell's Corners Partnership,* 174 B.R. 744, 762 (Bankr.N.D.Ill.1994). Courts should also consider if "a reasonable likelihood of reorganization exists" in determining whether the petition was filed in bad-faith. *See In re McCormick Road Assoc.,* 127 B.R. at 416.

All of the aforementioned indicia of bad-faith filings exist in the instant bankruptcy. The Debtor has few employees and the Property is its only asset. The only unsecured creditors are the insider equity holders of the Debtor. The Property has been the subject of a foreclosure action since September of 1993. The timing of the filing reveals the junior mortgagees intent to prevent foreclosure by LW in an effort to "protect the investment of WSC and Associates."

Furthermore, no reasonable likelihood of reorganizing the Debtor exists. The Debtor has disclaimed any intent to reorganize. The junior mortgagees seek not to reorganize the Debtor, but to recoup some of the monies from their failed investment. It is apparent to the Court that the instant filing involves bad-faith regardless of whether objective or subjective analysis are used. Allowing this proceeding to continue "would permit imaginative lawyers to misapply the bankruptcy remedies by contriving quixotic, albeit technically 'possible,' reorganization schemes to justify their improper filing." *Id.*

## III. CONCLUSION

The Court, therefore, grants the motions of LW and the Debtor to abstain from exercising jurisdiction pursuant to § 305(a), and to dismiss the case pursuant to § 1112(b).