**In re NRG ENERGY, INC., Alleged Debtor.**

**No. 02–33483.**

United States Bankruptcy Court, D. Minnesota, Third Division.

May 12, 2003.

22. *Sparks v. Day,* 61 Ark. 570, 33 S.W. 1073, 1074 (1896).

ORDER GRANTING MOTION
OF ALLEGED DEBTOR
FOR ABSTENTION

GREGORY F. KISHEL, Chief Judge.

This case was commenced by an involuntary petition under Chapter 11. At a hearing on April 10, 2003, the Court received evidence on the motion of NRG Energy, Inc. ("NRG") for abstention under 11 U.S.C. § 305(a)(1) or dismissal under 11 U.S.C. § 303(j)(2). Appearances were as follows: for NRG, David J. Zott, Brett A. Bakke, and Matthew A. Cantor, of Kirkland & Ellis, Chicago and New York, and James L. Baillie, of Fredrikson & Byron,

P.A., Minneapolis; for Shaw Constructors Group and Stone & Webster, Inc. (collectively "Shaw"), Brent B. Barrierre, of Phelps Dunbar, LLP, New Orleans, and Peter B. Stein and Eric J. Sherbume, of Stein & Moore, P.A., St. Paul; and for John A. Noer, David H. Peterson, Brian Bird, Leonard A. Bluhm, Craig A. Mataczynski, James Bender, and Roy R. Hewitt (collectively "the Original Petitioning Creditors"), William I. Kampf, of Kampf & Associates, P.A., Minneapolis, and Maurice W. O'Brien, of Miller–O'Brien, PLLP, Minneapolis. Other appearances were noted in the record. Upon the evidence received and the memoranda and argument of counsel, the Court memorializes the following order pursuant to Fed. R.Civ.P. 52(a) and Fed. R. Bankr.P. 9014.

### PARTIES TO MOTION AT BAR

NRG is a business corporation, organized in the State of Delaware. It produces and markets electric power on a non-regulated basis. It is a subsidiary of Xcel Energy, Inc. ("Xcel"), a major regional utility provider that historically serviced customers in the Upper Midwest. NRG and Xcel maintain their principal corporate offices in Minneapolis, Minnesota. NRG has some 3,600 employees in Minnesota. It has numerous subsidiaries in various forms of corporate organization, which do business in electric power generation across the United States and in Europe and in Asia.

LSP–Pike Energy, LLC ("Pike Energy") is a subsidiary of NRG. Pike Energy contracted with Shaw to construct an electric power plant in Pike County, Mississippi. In August, 2002, Shaw commenced suit against Pike Energy, NRG, and various other NRG affiliates in the United States District Court for the Southern District of Mississippi, alleging breach of the construction contract, a right to relief in quasi-contract, and tortious infliction of injury. In its complaint, it sought to affix liability in NRG under various theories, including alter ego, piercing of the corporate veil, and breach of a guaranty of Pike Energy's obligations to Shaw. This lawsuit is still pending.

The Original Petitioning Creditors are all former executives and officers of NRG. NRG's Board of Directors terminated their employment in May and June, 2002. Within three months of the terminations, NRG ceased making payments to them under their various employment agreements and non-qualified benefit plans. In October, 2002, they collectively brought suit against NRG in the United States District Court for the District of Minnesota, alleging breach of contract and seeking awards of damages to compensate them for the cessation of the post-termination payments. This lawsuit was settled during the pendency of this bankruptcy case.

### PROCEDURAL HISTORY
### OF THIS CASE

On November 22, 2002, the Original Petitioning Creditors filed a petition under 11 U.S.C. § 303(a) against NRG, praying for entry of an order for relief under Chapter 11. As the basis for their petition, they alleged that NRG was generally not paying its debts as they became due.

On December 16, 2002, NRG filed an answer and a statement of affirmative defenses to the involuntary petition. It disputed that the Original Petitioning Creditors had standing to commence an involuntary case, and it denied that it was generally not paying its debts as they became due. Styling further allegations as affirmative defenses, NRG stated that the involuntary petition had been filed in bad faith; that the Original Petitioning Creditors may have been recipients of transfers avoidable in a bankrupt-

cy case; and that abstention under 11 U.S.C. § 305 was warranted. It requested dismissal of this case, and an award of costs, attorney fees, and actual and punitive damages against the Original Petitioning Creditors.

On the same date, NRG filed a motion seeking abstention and dismissal of the case under 11 U.S.C. §§ 305(a) and 303(j). As alternate relief, it requested a mandate to the Original Petitioning Creditors to post a bond pursuant to 11 U.S.C. § 303(e).

Over the ensuing three months, the Court conducted several status conferences on the contested petition and NRG's motion.[1] In the meantime, on February 28, 2003, Shaw filed a document through which it purported to join in the involuntary petition. NRG objected to the joinder, though it did not set its objection on for hearing. At one of the status conferences, the Court ruled that a decision could be made on NRG's motion for abstention before the issues on the contested involuntary petition were presented.

Counsel for NRG and the Original Petitioning Creditors commenced discovery proceedings, and their clients entered negotiations. At a second status conference on February 25, 2003, counsel for NRG and the Original Petitioning Creditors announced that their clients had just reached a settlement of the underlying claims in litigation against NRG, in consequence of which the Original Petitioning Creditors were to withdraw their opposition to the Debtor's motion for abstention. The resolution was to be effected by those parties requesting the United States District Court to approve the settlement of the claims, in the context of the Original Petitioning Creditors' lawsuit; by the Debtor depositing a sum of money into escrow, to be paid eventually to the Original Petitioning Creditors on account of their claims; and by the Debtor giving notice to all of NRG's creditors, of the date and time of a hearing on the motion for abstention.

The Court approved NRG's proposed form for that notice; it also fixed the scope of the issues to be presented, directed a form of pre-trial disclosure of NRG's case in chief, and defined the format of the evidentiary presentation. The parties went on with discovery. After several calendar adjustments made at the parties' request, NRG's motion for abstention came on in open court on April 10, 2003.[2]

In the meantime, NRG and the Original Petitioning Creditors had presented their settlement to the United States District Court. There was no objection; on March 12, 2003, that court (Montgomery, J.) approved the settlement.

By April 10, Shaw was the only creditor or party in interest that continued to object to NRG's motion.[3] The only parties

1. Several times during this period, NRG and the Original Petitioning Creditors requested a deferral of a final hearing on these matters. The Court used the status conferences as a way to enforce the mandate of Fed. R. Bankr.P. 1013(a), that "[t]he court ... determine the issues of a contested petition at the earliest practicable time ..."

2. During the pendency of the negotiations, NRG did not pursue its motion to require the Original Petitioning Creditors to post a bond. On April 10, it did not argue the request or present evidence on it-clearly, because it had made peace with the respondents to the motion.

3. Over the three-and-one-half-month pendency of the motion, several other parties had filed formal objections or had stated their intention to do so, most saliently Connecticut Light & Power Company. By the time of the evidentiary hearing, Connecticut Light & Power Company had withdrawn its objection, and none of the others had come forward formally.

that participated in the development of evidence were NRG, Shaw, and the Original Petitioning Creditors.

### ISSUES PRESENTED

Via the present motion, NRG requests relief in the alternative. Its motion poses two issues:

1. Should the Court abstain from exercising jurisdiction over NRG's relationships with its creditors, and allow it to proceed with negotiations for a comprehensive debt restructuring or reorganization plan outside the strictures of a bankruptcy case?

2. In the alternative, should the Court dismiss this case because NRG is requesting it and the Original Petitioning Creditors that commenced the case now consent to that?

### FINDINGS OF FACT [4]

As noted earlier, NRG is a producer of electric power. It does business over a large area of the United States and the world, with generating capacity that it owns in its own right and with the assets of its subsidiaries. For several years in the late 1990s, it pursued an aggressive program of growth, which it executed through the purchase of existing, smaller utilities or their assets, and the formation of some 450 subsidiaries for the holding of these acquisitions or the construction of new generating facilities. NRG and its subsidiaries financed the growth in a number of ways, including issuances of public-

ly-traded bonds and debt securities. Between 1998 and the end of 2001, the total of the outstanding long-term debt of the Debtor and its subsidiaries increased from approximately \$626,000,000 to approximately \$8,300,000,000.

When the Debtor initiated this program, prevailing prices for electric power were relatively high, which justified and supported the expansion. In the second half of 2001, however, there was a world-wide slackening of demand for electricity, due to general economic slowdown, mild winter weather conditions in North America, an oversupply of generating capacity, and other reasons. Prices dropped precipitately. Utilities' revenues dropped, synergistically. Locked into substantial debt servicing requirements by the structures of its bond issues and other financing, NRG was experiencing a "severe liquidity squeeze" by the summer of 2002. The investment ratings of its public debt issues were downgraded. This triggered requirements under financing agreements and indentures to post additional liquid collateral, which NRG could not meet. In mid–2002, NRG and its subsidiaries began to default on payment obligations on bond issues and other financing.[5] In consequence of all this, sources of operating capital for NRG dwindled.

In July and August, 2002, NRG's management recognized that it needed major restructuring of its debt to its lenders and its bond– and note-holders. By Davido's estimate, the outstanding debt burden that

---

4. During the final status conference, NRG's bankruptcy counsel identified Scott J. Davido, NRG's senior vice-president, general counsel, and corporate secretary, as its only contemplated witness for its motion. Davido was, indeed, the only witness who gave testimony. The following findings of fact are based on his in court statements and the exhibits received.

5. In its Form 10–K for the fiscal year ending December 30, 2002, filed with the United States Securities and Exchange Commission, NRG admitted that its "financial condition ha[d] deteriorated significantly in the recent past," that it did not expect that it would "have sufficient funds to make required principal and interest payments on its corporate debt," and that it hence would remain in default to its bond-holders and major lenders.

NRG had to contend with in its own right and through its subsidiaries approached $11,000,000,000, arrayed in two tiers. The debt as to which the Debtor acknowledged direct or indirect liability totaled approximately $5,000,000,000, divided among operating credit facilities from banks (approximately $1,000,000,000); revolving credit facilities for subsidiary projects (approximately $1,000,000,000); a line of credit (approximately $125,000,000); and outstanding obligations to note-holders (approximately $3,000,000,000). The balance of the debt structure facing NRG, some $5,000,000,000 to $6,000,000,000 more, is attributable to its subsidiaries, for bank loans and private or public bond issues for the subsidiaries' individual projects.[6]

NRG's management began the restructuring effort by engaging Davido, an attorney with a total of 15 years of experience in complex Chapter 11 practice and in the direct management of a large financially-troubled business concern. After a brief period as a "consultant," Davido entered NRG's employ in October, 2002.

Under Davido's direction, NRG embarked on a complex of activity that intentionally mimicked many of the functions of a debtor in the opening stages of a Chapter 11 case. It identified several constituencies among its creditors, groups of them that had common interests under similar forms of financing or credit, and it enlisted members of these constituencies to form unofficial committees for the purposes of communication and negotiation.[7] It prevailed on these committees to hire counsel, financial advisers, and other professionals, and made their maintenance palatable by agreeing to pay the fees of such professionals "in most cases." [8]

While these committees were in formation, NRG's management addressed its lenders' collateral calls. After substantial negotiations, NRG obtained "stand-still" agreements on this issue, under which the lenders have forborne from enforcing their rights to require NRG to post additional cash as collateral. Starting in the late summer of 2002, this enabled NRG to use revenues for the maintenance of current operations, rather than locking them into the illiquid form of supplementary collateral. These agreements were memorialized into "collateral call extension letters" for successive periods of time. The second such expired on November 15, 2002, and the parties to it did not execute a second extension. However, all of the participants in this accord have continued to operate with each other and NRG on the same terms, based on NRG's compliance with the original two agreements.

The consequence of this arrangement is that NRG has had the benefit of a general forbearance by its major lenders, under which none of them have taken any action that would affect any other's rights or those of the Debtor. The Debtor, in turn,

---

6. It is not clear from the record whether the Debtor has any derivative or indirect liability on any of this debt.

7. Davido identified three main committees, all dealing directly with NRG on its largest financial issues: a "Global Bank Steering Committee," the members of which were institutional lenders and which accounted for approximately $2,000,000,000 of NRG's debt structure; a "Finco Group," composed of lenders for NRG-owned and subsidiaries' in-

dividual projects; and a "Note-holders' Committee," the members of which were holders of debt securities. NRG also promoted the organization of creditors for individual subsidiaries' projects, "to various degrees."

8. Davido observed that many of the agreements governing its relationships with its creditors gave individual constituents the right to recover attorney fees and other such expenses from NRG, in the event of default.

is subject to ongoing requirements to disclose information on its current operations, cash flow and financial posture, and to comply with various fiscal standards.

The record is not as precise as to the other organized constituencies in NRG's debt structure. However, it appears that NRG and its subsidiaries have had the benefit of similar stand-still agreements or understandings with them, since the late summer of 2002.

At the same time, to respond to these disclosure requirements and to enable further planning for a restructuring, NRG developed and implemented internalsystems to track its cash flow and to direct it in accordance with its understandings with creditors.

By mid-fall, 2002, the several months of this effort resulted in a stabilization of NRG's immediate situation, under which it was in no immediate jeopardy of any creditor enforcing contractual or legal rights against it directly. As part of the underlying accords, NRG agreed on a series of deadlines for its formulation of a business plan and a plan for the restructuring of its capitalization and debt. It met the deadlines for the preparation of those documents. In early November, 2002, it commenced negotiations toward the terms of restructuring, in which Xcel was a central participant. It appears that the filing of the involuntary petition in this case did not seriously affect the progress of the negotiations. They continued on a confidential basis for five months, through various levels and groupings of the creditors that were in privity with NRG itself.

By the end of March, 2003, NRG and Xcel reached a "preliminary settlement" with the Global Bank Steering Committee and the Note-holders' Committee. This accord identified the "principal elements of a restructuring at the NRG corporate level" and it included a "general under-standing as to NRG's balance sheet and capitalization" after the contemplated restructuring. Xcel committed to putting $752,000,000 of new capital into NRG, to effectuate the restructuring.

It was clear as of mid-April, 2003, that substantial work remained to be done to arrive at the details under this broad structure. Those matters included what Davido broadly termed "mechanical and technical issues;" this apparently denoted the specific terms under which any particular creditor's or constituency's claims would be paid, rights and mechanisms to govern collateral security, terms of default and enforcement, application of the funds from the recapitalization, and the like. Counsel had circulated drafts of various component agreements, but as of mid-April, 2003, the parties had not negotiated final and definitive language to memorialize the broad settlement.

Davido expected NRG to address and finalize the details of the restructuring of its own debt, as to which it had already begun "extremely sensitive" negotiations. He opined that Xcel's announced commitment to a substantial capital infusion had been an essential prerequisite to that process, which would make its completion much easier than before. He did note, however, that the accord with the institutional lenders left approximately $6,800,000,000 in debt to restructure, which was held by creditors that numbered at least in the hundreds, and into the thousands if the subsidiaries' full debt structures were factored in.

On the level of its subsidiaries' debt structures, NRG had made "some significant contact" of an undefined nature with the major creditors of each. Teams within NRG's management had been assigned to each subsidiary's project; they were to continue to negotiate with the involved

creditors toward restructurings for subsidiaries that needed them. Davido anticipated that the process at the subsidiaries' level would also require great effort and much time. As to the scope of the demand that this would put on NRG's resources, he could only say that it was unclear at the time whether all of the subsidiaries required restructuring, or precisely which among them would. The clear implication of his testimony was that NRG had given higher priority to the resolution of its own issues with creditors, which were of several levels of magnitude greater than those of any individual subsidiary. However, it also was clear that NRG planned to redirect substantial resources to the subsidiary level in the near future.

As for the outcome of the restructuring process, Davido forecast that it was "likely" that NRG would use the reorganization process of Chapter 11 to implement a negotiated restructuring. He stated that, in his and other managers' estimation, NRG was not ready to initiate a voluntary filing under Chapter 11, premised on a comprehensive negotiated restructuring, as of mid-April, 2003; there simply was no such integrated structure at hand, to incorporate into a plan that could be put before the court soon after the filing.[9]

Despite the fact that NRG would have the full options afforded to a debtor-in-possession in this case, were an order for relief to be entered here, it maintains its motion for abstention, and seeks to have this case dismissed. Its rationale is expressed in terms of an interaction between timing and cost.

In Davido's view, the negotiation of a comprehensive restructuring, as the main framework of a plan of reorganization, is best and least expensively done before a debtor-business entity is subject to the formal and relatively inflexible duties of periodic disclosure and reporting, court oversight, and complicated accountability in form and substance that are required in an ongoing case under Chapter 11. He predicted that, were an order for relief to be entered in this case, NRG would have to immediately cease discussions on the terms of restructuring on multiple fronts. Managerial and professional resources would be redirected to meeting the multiple obligations of reporting and compliance that are imposed on a debtor-in-possession newly-arrived in Chapter 11. He pointed to the need to finalize and present complex arrangements on the use of cash collateral, requests for authority to meet payroll and maintain ordinary payments, and other such "first day" issues as only one example of the sort of procedural, financial, and administrative burdens that NRG has avoided by making private arrangements with committees and creditors to date. He noted that it would be necessary to give substantial attention to the anticipated reactions of "critical vendors," those suppliers that NRG depended on for supplies, service, and power on a wholesale basis to maintain daily business; to avoid interruptions in provision, NRG would have to reach accommodations with them under the framework of bankruptcy law. Finally, he opined that existing relationships of relative trust among NRG, the committees, and individual creditors, would be upset to some degree by the interposition of oversight by the United States Trustee and the appointment of formal committees under Chapter 11's principles. This, Davido said, would require some duplication of

9. The record is not clear whether the Debtor would seek the protection of Chapter 11 for any or all of its subsidiaries, as part of an overall strategy for implementation. In direct examination, Davido never spoke to that issue with specificity. No one inquired on cross-examination.

effort in reestablishing working relationships and understandings under the dictates of bankruptcy law.

Davido stressed NRG's strong wish to maintain confidentiality for its negotiations with the remaining constituencies, to promote a quicker coordination of the results into a global form of restructuring. He attested in convincing fashion to the heavy burden of fielding dozens to hundreds of inquiries from individual members of a constituency, before and after formal sessions of negotiation with committees, based on actual experience during NRG's negotiations with the committees. He opined that the higher visibility and sequential pace of individual court proceedings in an "unplanned" Chapter 11 case would multiply the burden of such followup response, on a near-exponential basis.

NRG's push, then, is to be freed of the jurisdiction of this Court. Once out, it maintains, it could finish the complex restructuring process now half-way done, taking as long as that needs if the forbearance agreements hold out. It then would make a decision whether to file for Chapter 11 in its own right, and proceed accordingly.

To somewhat opposite effect, Davido acknowledged that counsel and management have already given attention to a number of formal aspects of participation in Chapter 11, including the identification of necessary "first day" motions, drafts of cash collateral agreements, and a search for financing for post-petition operations. It was not clear whether these hedges were being worked against the possibility of an order for relief in this case, a future volun-

tary filing, or both, but the third seems the most likely.

## DISCUSSION

NRG relies on two alternative theories for its bid for dismissal.

### I. 11 U.S.C. § 305(a)(1): Abstention

NRG's preferred theory is under 11 U.S.C. § 305(a)(1):

> (a) The court, after notice and a hearing, may dismiss a case under [the Bankruptcy Code], or may suspend all proceedings in a case under [the Bankruptcy Code], at any time if-
>
> (1) the interests of creditors and the debtor would be better served by such dismissal or suspension . . .

■ This is a grant of authority to decline to exercise another grant of authority. The initial grant, of course, is the endowing of jurisdiction over all cases under the Bankruptcy Code and all civil proceedings arising in them, which is given by 28 U.S.C. §§ 1334(a)-(b).[10] Under § 305(a), however, the bankruptcy court may decline to exercise that jurisdiction, relegating a debtor and its creditors to the governance of non-bankruptcy law. H.R. REP. No. 595, 95th Cong. 1st Sess. 325 (1977); S. REP. No. 989, 95th Cong.2d Sess. 35 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5963, 5787. *See also In re G–N Partners,* 48 B.R. 459, 461 (Bankr.D.Minn.1985) ("Congress has therefore given the Court the power to actually decline the jurisdiction that Congress has given it . . .").

In its one generally-applicable aspect,[11] § 305(a) identifies the grounds for absten-

---

**10.** The statutory grant is to the district court. The judicial authority under this jurisdiction can be delegated to the bankruptcy judges of a district, by reference under 28 U.S.C. § 157(a). In Minnesota, the reference has

been made by operation of Loc. R. Bankr.P. (D.Minn.) 1070–1.

**11.** 11 U.S.C. § 305(a)(2) authorizes abstention from exercising jurisdiction over a case ancillary to a foreign bankruptcy or insolven-

tion in broad language, making the relevant measure the "interests of creditors and the debtor." This language has been construed as vesting the bankruptcy courts with discretionary authority. *E.g., In re Spade,* 269 B.R. 225, 227 (D.Colo.2001); *In re Central Mtg. & Trust, Inc.,* 50 B.R. 1010, 1021 (S.D.Tex.1985); *In re Sherwood Ents., Inc.,* 112 B.R. 165, 167 (Bankr. S.D.Tex.1989); *In re Fitzgerald Group,* 38 B.R. 16, 17 (Bankr.S.D.N.Y.1983). To different effect, however, some courts have said it gives "an extraordinary power which therefore must be exercised with extraordinary care." *In re G–N Partners,* 48 B.R. at 461. *See also In re Paper I Partners, L.P.,* 283 B.R. 661, 678 (Bankr. S.D.N.Y.2002); *In re RCM Global Long Term Capital Appreciation Fund, Ltd.,* 200 B.R. 514, 525 (Bankr.S.D.N.Y.1996); *In re 801 South Wells St. L.P.,* 192 B.R. 718, 726 (Bankr.N.D.Ill.1996); *In re Grigoli,* 151 B.R. 314, 319 (Bankr.E.D.N.Y.1993); *In re MELP, Ltd.,* 143 B.R. 890, 892 (Bankr.E.D.Mo.1992).

■ The observation in *G–N Partners* is somewhat overstated, or at least has been undercut in rationale a bit by legislative amendment.[12] Nonetheless, given the limitation on appellate review, it is clear that the issue of abstention under § 305(a) requires a thorough vetting of the relevant facts, and a careful analysis of the consequences of the alternate results. This is best done by identifying the practical benefits to all constituencies of resolving a debtor's financial distress under the respective legal regimes, and in their affiliat-

ed forums. *In re Spade,* 269 B.R. at 227 (bankruptcy court should make very specific findings of fact to support decision on motion for abstention under § 305(a)).

■ As courts will, they have expounded at length in an attempt to make the bare language of § 305(a) more amenable to comprehension and application. The results, of course, have been a variety of "tests," or aggregations of relative "factors" to consider. Ultimately, these considerations have been assembled into a seven-factor list:

1. The economy and efficiency of administration;

2. The availability of another forum, or the actual pendency of an insolvency proceeding in one;

3. The essentiality of federal jurisdiction to a just and equitable resolution;

4. The availability of alternative means for an equitable distribution of assets and value;

5. The lesser cost of a non-bankruptcy process that would serve all interests as well;

6. The possibility that commencing administration in bankruptcy would duplicate previous effort toward a workout in a non-bankruptcy setting; and

7. The purpose for which bankruptcy jurisdiction was sought by the petitioners.

cy proceeding-a rather rare bird on most courts' dockets.

**12.** As expressly noted in *G–N Partners,* 48 B.R. at 461, the strength of its observation sprang in large part from the circumstance that the original language of 11 U.S.C. § 305(c) completely insulated an abstention decision from appellate review. Bankruptcy Reform Act of 1978, Pub.L. No. 95–598,

§ 101, 92 Stat. 2561 (effective Oct. 1, 1979). That language was amended in 1990 by the Judicial Improvements Act of 1990, however. Pub.L. No. 101–650, § 309, 101 Stat. 5113 (effective Dec. 1, 1990) (decision under § 305(a) is not reviewable by appeal to court of appeals or by Supreme Court of the United States).

*In re Fax Station, Inc.,* 118 B.R. 176, 177 (Bankr.D.R.I.1990). *See also In re 801 South Wells St. L.P.,* 192 B.R. at 723; *In re Trina Assoc.,* 128 B.R. 858, 867 (Bankr. E.D.N.Y.1991).

 This iteration's components reflect the "paradigm case" for abstention identified in the legislative history:

> The court may dismiss or suspend under [§ 305(a) ], for example, if an arrangement is being worked out of court, there is no prejudice to the rights of creditors in that arrangement, and an involuntary case has been commenced by a few recalcitrant creditors to provide a basis for future threats to extract full payment. The less expensive out-of-court workout may better serve the interests in the case . . .

H.R. REP. No. 595, 95th Cong. 1st Sess. 325; S. REP. No. 989, 95th Cong.2d Sess. 35, U.S.Code Cong. & Admin.News 1978, pp. 5963, 6281, 5787, 5822; *In re Artists' Outlet, Inc.,* 25 B.R. 231, 234 (Bankr. D.Mass.1982); *In re Wine and Spirits Specialties of Kansas City, Inc.,* 142 B.R. 345, 347 (Bankr.W.D.Mo.1992); *In re Sherwood Ents.,* 112 B.R. 165, 167–168 (Bankr.S.D.Tex.1989); *In re Luftek, Inc.,* 6 B.R. 539, 548 (Bankr.E.D.N.Y.1980). Substantial support by creditors for abstention and a non-bankruptcy process is an important factor in the analysis. *In re Iowa Trust,* 135 B.R. 615, 623 (Bankr.N.D.Iowa 1992); *In re M. Egan Co., Inc.,* 24 B.R. 189, 191 (Bankr.W.D.N.Y.1982). Ultimately, though, in passing on abstention under § 305,

> a bankruptcy court is not bound by a prescriptive template; it may consider any factors it deems relevant to the determination of whether it is in the best interests of the parties to the suit [*sic* ] to seek dismissal.

*In re Spade,* 269 B.R. at 228. *See also In re Iowa Coal Mining Co.,* 242 B.R. 661, 671 (Bankr.S.D.Iowa 1999).

The unspoken thought here is that the "interests of creditors and the debtor" coincide with the values that underlie the Bankruptcy Code's legal regime. Those values include a playing field level among creditors similarly-situated under non-bankruptcy law, in which no single one gets an undue advantage over others; an orderly administration of the value inherent in current assets or future revenues, and the preservation of as much of that value as possible during that administration; and the assurance of a responsible distribution to creditors, prioritized and rateably in accordance with the expectancies each constituency properly had before the debtor's financial distress began. *E.G., In re Taylor Agency, Inc.,* 281 B.R. 354, 361 (Bankr.S.D.Ala.2001); *In re Wine and Spirits Specialties of Kansas City, Inc.,* 142 B.R. at 347 (creditors' deference to debtor's self-conducted liquidation and confidence in debtor's good faith in completing distribution of proceeds supported abstention); *In re Fitzgerald Group,* 38 B.R. at 18 (completion of winding-up of partnership under state law would result in prioritized and ratable distribution, hence abstention merited). These values are consistent with the structure of most consensual "global" workouts. *In re Colonial Ford, Inc.,* 24 B.R. 1014, 1021 (Bankr. D.Utah 1982).

 One prominent factor that militates in favor of a consensual arrangement under a non-bankruptcy process is economy. For two decades or more, the courts have recognized that the notice requirements, procedural exactitude, and public oversight that debtors-in-possession assume in exchange for the court's protection and imprimatur entail rapidly-mounting costs, and can consume more time as well. *E.g.,*

*In re Spade,* 269 B.R. at 228; *In re Fitzgerald Group,* 38 B.R. at 18; *In re Colonial Ford, Inc.,* 24 B.R. at 1016 (high administrative costs of Chapter 11 diminish value available for distribution to lower-priority claimants).

Over that time, private and public participants in the bankruptcy process acknowledged the tensions between these alternate vehicles, recognized the benefit of the federal forum, and then developed means for cost containment that keep the protections of the bankruptcy jurisdiction.

One, the statutory "fast track" form of reorganization for small businesses, appears to have had marginal utilization, and marginal utility. *See In re Coleman Enterprises, Inc.,* 266 B.R. 423, 430–432 (Bankr.D.Minn.2001).

Two others, the so-called "pre-packaged plan" and the "pre-negotiated plan," have been used extensively in some jurisdictions. *See United Artists Theatre Co. v. Walton,* 315 F.3d 217, 224 n. 5 (3d Cir. 2003) (defining "prenegotiated bankruptcy" and "prepackaged bankruptcy"); *In re Pioneer Fin. Corp.,* 246 B.R. 626, 630 (Bankr.D.Nev.2000) (defining "prepackaged plan" and "prenegotiated plan"); *In re Sunshine Precious Metals, Inc.,* 142 B.R. 918, 919 (Bankr.D.Idaho 1992); *In re TS Industs., Inc.,* 117 B.R. 682, 688 (Bankr.D.Utah 1990). *See also, in general,* Mark E. MacDonald and Daren W. Perkins, *Prepackaged Chapter 11 Plans:*

*The Alternative to 'Free Fall' Bankruptcy,* 1 J. OF BANKR.L. & PRACT. 31 (1991). Building on the Code's grant of leave under 11 U.S.C. § 1126(b) to solicit binding acceptances of a plan before a Chapter 11 filing, practitioners have sought and some courts have established expedited procedures for the early approval of disclosure statements, solicitation of acceptances, and confirmation of plans that are based on terms of debt restructuring negotiated pre-petition.

Coupled with a judicial willingness to entertain debtors' requests for "first-day orders" on extremely abbreviated notice and with substantial deference to debtors' substantive proposals, these developments have led to a distinctive mode of practice in the bankruptcy reorganization of large business concerns, almost a regional legal culture in itself. *E.g.,* Sandra E. Mayerson, *Current Developments in Prepackaged Bankruptcy Plans,* 787 PLI/Comm 937 (1999) (describing procedures adopted in Southern District of New York).[13]

Clearly, the presentation of a pre-packaged plan in a bankruptcy case is the contingency against which NRG's bid for abstention must be evaluated. Davido acknowledged the possibility that NRG would go through formal reorganization in a new case under the Bankruptcy Code, after fully framing and fine-tuning a restructuring. He was quite guarded about the likelihood, but it is improbable that NRG will do anything but. NRG's debt

---

**13.** The whole phenomenon has not been without critics. Some of them have mustered empirical analysis to bolster their argument that the process is no more effective in the long term than the Code's standard structure for reorganization. In these commentators' view, the Delaware/New York complex of practices may exit large companies from bankruptcy with insufficient attention to the deep roots of their insolvency, leading to the need to file for Chapter 11 again. *E.g.,* Lynn M. LoPucki and Sara D. Kalin, *The Failure of Public Company Bankruptcies in Delaware and New York: Empirical Evidence of a 'Race to the Bottom',* 54 VAND. L.REV. 231 (2001); Lynn M. LoPucki and Sara D. Doherty, *Why are Delaware and New York Bankruptcy Reorganizations Failing?,* 55 VAND. L.REV. 1933 (2002). For another view based on the same data, *see* Robert K. Rasmussen and Randall S. Thomas, *Whither the Race? A Comment on the Effects of the Delawarization of Corporate Reorganizations,* 54 VAND. L.REV. 283 (2001).

structure is probably too complex, and its creditors too great in number and variety, to expect a universal deference to any compilation of accords negotiated with single large lenders and representative committees. Too, the large prominence of bond and public debt issues in its debt structure is an especially strong indicant of the need for formal reorganization in bankruptcy. The Code addresses just this issue; confirmation of a plan binds all members of classified constituencies to the treatment of their claims, despite individual members' rejection of the plan. 11 U.S.C. § 1141(a).[14] The real question is whether NRG should be required to go forward in the confirmation process now in this case, at a time not quite of its choosing, and before it has achieved a comfortable breadth of resolution and accord.

Thus far, NRG has made substantial progress toward the milestones of a plan of reorganization; it would not be starting from scratch in this case or outside. It has done so, however, under a best-of-all-possible-worlds scenario—duly protected by forbearance agreements and the automatic stay, but without the burden of the Code's regimen for accountability. If an order for relief is entered in this case, NRG will have to shoulder that burden immediately. In a case with debt and asset structures valued in the multiple billions of dollars, and with the likelihood of thousands of creditors entitled to notice, that burden will be substantial and consuming. It would continue until an equi-

librium under bankruptcy-law principles is achieved, consensually or through litigation. The transactional costs—professional compensation, noticing expenses, the quarterly fee to the U.S. Trustee System Fund, among others—would be large. Many of them would be directly attributable to the presence in Chapter 11, rather than to the general effort to adjust the terms of debtor-creditor relationships.

NRG's management professes to be willing to leave its shelter under the bankruptcy jurisdiction, and to expose NRG to unrestrained creditor action, to avoid an immediate assumption of the transactional costs of a Chapter 11 case. It believes that the former presents a lesser risk. It characterizes the latter as premature, unnecessary, and excessive, if they were to be generated out of the present, half-resolved state of its relationships with creditors. The question posed by this motion, then, is whether this outcome-scenario, coupled with the prospect of a return to Chapter 11 on a voluntary basis at some future date, is more in the interests of creditors and NRG than leaving NRG in Chapter 11 here, in this case.

The merits of NRG's position are not unimpregnable, but Shaw's arguments simply do not carry enough weight to the contrary. The reasons are several.

The costs of noticing and presenting the formal motions that would be incumbent on NRG as a debtor-in-possession early in the case [15] would be very substantial, when

---

14. The relevant text of this statute is:

(a) ... the provisions of a confirmed plan bind the debtor, any entity issuing securities under the plan, any equity acquiring property under the plan, and any creditor, equity security holder, or general partner in the debtor, whether or not the claim or interest of such creditor, equity security holder, or general partner is impaired under the plan and whether or not such creditor, equity security

holder, or general partner has accepted the plan.

15. The varieties of such motions number several dozens. The usual ones are requests for authority to use cash collateral and to afford adequate protection, for the resolution of issues over honoring outstanding checks and payroll payments, for authority to obtain post-petition financing, for leave to pay ordinary-course pre-petition claims of "critical ven-

there could be hundreds or thousands of parties entitled to receive them under rule and statute. The professional fees attendant to preparing documents, negotiating stipulations, attending court hearings, and giving post-hearing detail on such formal matters would also be large. Debt service on post-petition financing, or even the costs of maintaining liquidity under cash collateral agreements, would likely be higher than that imposed on a debtor outside of bankruptcy.[16]

Many of these formal proceedings in a bankruptcy case have corollary functions in an out-of-court workout or restructuring. The formalities of memorializing them do not include the overlay of court documents, proceedings, and hearings, though. None of these sorts of proceedings would be avoided in a "planned" Chapter 11 case. However, they could be simplified by a coordinated pre-petition effort, which would be finalized without the immediate distraction of meeting early-case requirements from the United States Trustee and without the larger-scale distraction of fending off motions and other proceedings brought by creditors on the offensive in the formal arena of the bankruptcy court. Such responsibilities all descend on a reorganizing debtor in its early days in Chapter 11, in a multitude but focused down to a pinpoint of burden. Their weight increases by multiples with the magnitude and complexity of debt and asset structures. Because the automatic stay becomes a focus of litigation itself, it often is not an immeasurable God-send of protection, as compared to a forbearance agreement. Any bankruptcy judge with any length of experience can attest to larger cases that were marked by a "feeding frenzy" in their first weeks, with multiple creditors and constituencies jousting for advantage out of the fear that a more permanent ordering of priorities and claims will set in before they act themselves.

The paradoxical concept of "too big to fail," then, seems to apply with a gut-level verisimilitude to a besieged debtor like this one. It gives a substantial incentive to creditors to forbear and to work things out, as long as the debtor is responsible and responsive. A hasty and unwarned injection into bankruptcy might lift the lid off, however. Shaw's protestation, fundamentally, is that NRG is engaged in forum-shopping for the inevitability of a second filing, when it could proceed in this case at the same cost or less. There is a shallow sheen of attraction to this, to be sure. However, in the end it is simply not as persuasive as NRG's presentation, against the courts' accumulated real-life experience in the economics of debtor-creditor restructuring through Chapter 11, particularly in very large cases.[17]

---

dors," and the like. One would assume that NRG would not have to make peace with a utility provider under 11 U.S.C. § 366, but one never knows.

**16.** Davido's uncontroverted controversy is to this effect. So is the experience in many reorganizations.

**17.** This passage of time is why Shaw's heavy reliance on several summary pronouncements in *G–N Partners* is unfortunate. That decision truly came from a different place, long, long ago, and far, far away. In the first instance, the movant in *G–N Partners* was a single creditor, not a debtor, and one that seemed to have no theory for the motion that matched to the considerations specified by the statute. 48 B.R. at 461. The movant ignored the "paradigm case" for abstention identified in the legislative history–probably because there was no factual basis for it–and never articulated a reason why a return to the governance of state law would further a *global* resolution of the debtor's problems. *Id.* It is no wonder, then, that the *G–N Partners* court phrased a rationale in language as restrictive of the scope of § 305(a). Times have changed, and this case is hugely different; the lamp of

Beyond these specifics of cost in dollars, there is a more intangible aspect that goes to the efficacy of the process: the complex pace and momentum of settlement negotiations that are going on simultaneously on many different fronts, all focused back in on NRG directly or indirectly. NRG's uncontroverted evidence strongly suggests that this sort of complex restructuring has become very much an art in itself, forcing participating professional persons to develop specialized expertise and a heavy focus on coordination. The intended results of such a process, of course, are to be desired; Congress made that clear. *See In re Colonial Ford, Inc.,* 24 B.R. at 1015–1018, and legislative history cited therein. The dynamics of the corollary process in a Chapter 11 case are somewhat different, however—not exclusively focused on the end-product, more consumed by the formalities of accountability, economically burdened by additional transactional costs, and marked by the strong likelihood of a greater cost of financing.

. In this case, a restructuring process began before the filing of the involuntary petition, but it obviously achieved its speed afterwards. NRG and its professional persons have had the benefit of that best-of-all-possible-worlds position, in being able to pursue a multi-leveled restructuring as if NRG were not in bankruptcy. However, there is the specter that much of a partly-completed process could be derailed at least temporarily, were NRG formally put into Chapter 11 by the entry of an order for relief. In such instance, significant further delay is possible and substantially greater expense is probable.

Evidence, experience, and the whole surrounding ethos make this scenario much more likely than the one that Shaw's counsel suggests, that all participants would go forward without a blink. There is just too much in the record to indicate that progress in negotiations would be set back by days-to-weeks, were NRG locked into bankruptcy in this case. There is much more to establish that the transactional costs would be markedly greater than those for the completion of an out-of-court process, even were its results segued into a second Chapter 11 case. Shaw's bland but conclusory assertion that NRG can continue its negotiations while in Chapter 11, but in an open and supervised process, is not evidence. More to the point, its insinuation—that such is the only defensible procedure—is belied by accumulated experience, surrounding circumstances, and common sense.

To sum it up: there is a significant risk that forcing the maintenance of the bankruptcy jurisdiction over negotiations well-started under different assumptions and rules would unduly distort the process, reduce creditors' ultimate realizations, and prejudice the results. This debtor was injected into involuntary bankruptcy by a small group of creditors whose claims were a very small component of a huge debt structure. They believed that their interests were not being recognized or heeded in negotiations that were well underway; they used a threat–the Archimedes' lever of involuntary bankruptcy—to command NRG's attention. They got what they wanted, on a compromised basis,[18] but in the meantime they put NRG into the arena of bankruptcy before it believed it was best-put to use it.

experience prompts a slightly more accepting notion of the statute's applicability.

**18.** Davido testified that the negotiations with the Original Petitioning Creditors had been hard-fought, until all parties agreed to the payment of claims reduced from the amounts the petitioners had demanded previously.

In the end, NRG's argument and proof on the primacy of timing are convincing enough. At this time, abstaining from exercising the bankruptcy jurisdiction over NRG and its creditors is more in the general interest than the alternative, which would be relegating NRG to litigate a contested involuntary petition and then proceed into formal reorganization if appropriate. Considerations of cost, efficiency, latitude in action, and likelihood of better outcome all support this conclusion. It is reinforced by a congressional preference for negotiated resolution of systemic financial distress, whether that resolution is ultimately effectuated · under non-bankruptcy law or through a subsequent bankruptcy filing.

This could end the discussion, but for the other aspect of Shaw's argument noted earlier:

> NRG clearly is contemplating a prepackaged bankruptcy filing and is using its motion to abstain as a stepping stone to a future filing in a different forum.
>
> . . .
>
> This Court must be wary of NRG's motives in seeking this Court's abstention . . . Granting NRG's motion under Section 305 may be viewed as a tacit endorsement of NRG's arguments including (1) that NRG continues to operate its business and is generally paying its debts as they become due, (2) that NRG can decide when and where to file a reorganization, and (3) that Minnesota is not an appropriate forum for such a filing.

Shaw pitches this argument against the backdrop of the "Chapter 11 venue issue," a phenomenon that has received much comment in legal literature high and low. This, of course, is the incidence of Chapter 11 filings by debtors with very large debt and asset structures, or with publicly-traded equity, in a very small number of federal judicial venues. Most prominent among those venues are the District of Delaware where numerous large and/or publicly-held business entities are incorporated, and the Southern District of New York, where, for reasons of management, finance, or operation many prominent American corporations have a presence of some sort. Once filed in these venues, such debtors often use the "prepack" procedures to get through the case quickly. *See* articles cited *supra* at p. 82, n. 13.[19]

NRG may be positioning itself for a filing under Chapter 11 in one of these districts, right now; if its management has elided the issue to some degree in this case, not a soul has been fooled. Ultimately, however, the prospect is beside the point. The argument made here, by Shaw, is simply not one that a court can recognize in the context of a motion for abstention. If abstention is appropriate on the merits recognized by Congress, the result cannot be unseated by the prospect of a voluntary refiling for the very same relief in another forum. That has to be so even if the successor forum turns out to be one

---

19. The motivation for these venue choices is a matter of debate. Some commentators attribute the choices to a perceived judicial deference to reorganizing debtors, particularly the interests of their management, and a willingness to alter notice and procedural requirements at their request. *See* discussion in Theodore Eisenberg and Lynn M. LoPucki, *Shopping for Judges: An Empirical Analysis of Venue Choice in Large Chapter 11 Reorganizations*, 84 CORNELL L.REV. 967, 1001–1003 (1999). The justification publicly espoused is the judicial expertise in the often complex and very specialized issues of these cases that these districts' judiciaries develop. David A. Sheel, Jr., *Bankruptcy Judges and Bankruptcy Venue: Some Thoughts on Delaware*, 1 DEL L.REV. 1 (1998); David A. Sheel, Jr., *Lockups and Delaware Venue in Corporate Law and Bankruptcy*, 68 U. CIN. L.REV. 1243 (2000). There may be some truth in both.

to which a debtor is less "connected" in the maintenance of physical assets; the degree of local investment; the extent of creditor, management, or employee presence locally; or any way other than the attenuated link of situs of incorporation.

■ The reason is that 28 U.S.C. § 1408 gives a reorganizing debtor an initial choice of forum. Congress elected to make "domicile" a basis for choosing venue in a particular district. With the growth of the "Delaware phenomenon," the propriety of this policy choice has been increasingly debated, but Congress has not effected a change of its original policy. The possibility of a transfer under 28 U.S.C. § 1412 is a check on the debtor's power to elect venue. The check, however, is exercised post-petition, on motion, and on all of the facts put at that time before the court of the initial filing. A court is ill-suited to forecast the factors that would go into either "justice" or "convenience" for such a motion, whether for a date in the near future or far. The record for doing so for this debtor at this time is completely lacking.[20]

The same considerations mandate the denial of Shaw's alternate request, that this Court "condition" a dismissal of this case on a mandate to NRG to file a future Chapter 11 petition in this Court. Issues

of ripeness and enforceability aside, the request simply does not recognize the governing law, as just summarized.

NRG, therefore, has made its case, that the relinquishment of bankruptcy jurisdiction over it and its creditors is appropriate, at this time. Its motion for abstention will be granted.

## II. 11 U.S.C. § 303(j)(2): Dismissal

In the alternative, NRG requested dismissal of this case pursuant to 11 U.S.C. § 303(j)(2):

> (j) Only after notice to all creditors and a hearing may the court dismiss a petition filed under [the Bankruptcy Code]—
>
> . . .
>
> (2) on consent of all petitioners and the debtor . . .

NRG maintained that this relief was merited for an eminently simple reason: as part of its settlement with the Original Petitioning Creditors, those parties agreed not to oppose a dismissal of this case.

The matter was not as simple as that, however, due to Shaw's later-filed joinder in the involuntary petition. Shaw argued that its refusal to now consent defeated NRG's case on this ground, at least insofar as an unconditioned dismissal was concerned.[21] In response, NRG argued that

---

20. Another point deserves a mention: seriously entertaining the argument could put the assigned judge into an odd sort of conflict, intangible but nonetheless cognizable. It is a verity that very large Chapter 11 cases are attractive to most bankruptcy judges, for reasons that match their own motivations in taking appointment to judicial office. They involve interesting issues of law, and give novel insights into the workings of fundamental components of the American economy. They usually feature high-quality lawyering; sometimes that breeds excess complexity, but more often it makes the job of judging easier and more enjoyable. And they offer media attention, an opportunity to educate the pub-

lic, another forum to display the work-product of hard judicial effort. Such heady attractions, however, go to the judicial ego, and not necessarily to justice. A pitch like Shaw's is framed as an emotional accusation of gamesmanship, but it offers precious little substance. More critically, it presents an opportunity to subordinate a result that is consistent with the law, to a judge's sense of self-importance and personal territoriality. The temptation should be eschewed, and so it is.

21. In its final written argument, Shaw complicated the issue by stating that it would *not* object to dismissal under § 303(j) as long as it were conditioned on a mandate to re-file in

Shaw lacked standing as a petitioning creditor.[22] As NRG would have it, Shaw thus does not count as a "petitioner" for any purpose under § 303, and specifically does not factor into the issue of a unanimity of petitioner consent under § 303(j). In rejoinder, Shaw argues that Congress's unadorned use of the word "petitioner" in § 303(j)(2) signifies an intent to include all who, *de facto*, sought relief against a debtor on an involuntary basis, whether they had standing to do so or not.

This all presents a set of pretty issues.[23] It is not necessary to get snarled in their complexities, however, because the result under § 305(a) affords a disposition at the more fundamental level of jurisdiction. Call it mootness, or call it judicial restraint, but a ruling on this issue is not necessary, and will not be made.[24]

## DISPOSITION

IT IS THEREFORE ORDERED:

1. Pursuant to 11 U.S.C. § 305(a), this Court abstains from exercising jurisdiction over any aspect of this case, which is hereby dismissed.

2. NRG's alternate motion for dismissal under 11 U.S.C. § 303(j)(2) is denied, as moot.

---

the District of Minnesota. For the reasons noted in the discussion under § 305(a), such a result would be inappropriate. The mere suggestion also calls into question the strength of Shaw's commitment to a consistent application of the law-as opposed to a specific outcome acceptable to it.

22. Consistent with its position throughout this case, NRG maintained that it had a bona fide dispute with Shaw over its liability on account of Shaw's claim against Pike Energy. It denies Shaw's theories of liability via alter ego and piercing of the corporate veil, and it maintains that its liability as guarantor lapsed under the guaranty's express terms.

23. The analysis would be further complicated by the fact that, after the close of the record on this motion, other creditors-FirstEnergy Ventures Corp., The Toledo Edison Company, The Cleveland Electric Illuminating Company, Fortistar Capital, Inc., and Fortistar Meth-

ane, LLC-filed joinders in the involuntary petition. On its face, this appears to have been a tawdry gambit to further derail NRG's motion under § 303(j)(2). What is worse, some of the creditors that did it had maintained a fairly constant but low-level presence through local counsel throughout the case. The joinders could have been made much earlier. The good faith and responsibility of the late-fired shot are quite suspect.

24. This obviates the need to get into the issue of whether NRG's settlement with the Original Petitioning Creditors was made in good faith, a consideration considered relevant to the analysis under § 303(j)(2) in some of the cases. *In re Warren*, 181 B.R. 136, 138 (Bankr.N.D.Ala.1995); *In re Rajneesh Neo-Sannyas Internat'l Commune*, 59 B.R. 49, 51 (Bankr.D.Or.1986).